65 A.3d 265

NEW JERSEY DIVISION OF YOUTH AND FAMILY SERVICES,[1]
PLAINTIFF–RESPONDENT, v. L.M. AND P.T.,
DEFENDANTS–APPELLANTS.

IN THE MATTER OF THE GUARDIANSHIP
OF M.M., N.M., AND S.M., MINORS.

Superior Court of New Jersey
Appellate Division

Submitted January 14, 2013—Decided February 12, 2013.

---

[1] Effective June 29, 2012, the Division was renamed the Division of Child Protection and Permanency. *L.* 2012, *c.* 16.

430 

Before Judges GRAVES, ESPINOSA, and GUADAGNO.

*Joseph E. Krakora*, Public Defender, attorney for appellant L.M. (*Carol A. Weil*, Designated Counsel, on the brief).

*Joseph E. Krakora*, Public Defender, attorney for appellant P.T. (*Dianne Glenn*, Designated Counsel, on the brief).

*Jeffrey S. Chiesa*, Attorney General, attorney for respondent (*Andrea Silkowitz*, Assistant Attorney General, of counsel; *Erin O'Leary*, Deputy Attorney General, on the brief).

*Joseph E. Krakora*, Public Defender, Law Guardian, attorney for the minors (*Nancy P. Fratz*, Assistant Deputy Public Defender, on the brief).

The opinion of the court was delivered by

GUADAGNO, J.S.C. (temporarily assigned).

In these consolidated appeals, L.M. (Laura) [2] appeals from a November 9, 2011 judgment of guardianship, terminating her parental rights to three of her children, M.M. (Martin), born September 25, 2001; S.M. (Sally), born October 2, 2002; and N.M.

---

[2] Fictional names are used in referring to the parties and one of the foster families to protect their privacy and for ease of reference.

(Norman), born July 8, 2009. Sally's father, P.T. (Peter), appeals from the same judgment which terminated his parental rights to his daughter. Martin's father voluntarily surrendered his parental rights and Norman's father was never identified.

We affirm the judgment as to the termination of Laura's parental rights to Martin and Norman, but because the Division of Youth and Family Services (DYFS or the Division) failed to prove all four prongs of *N.J.S.A.* 30:4C–15.1(a) by clear and convincing evidence as to Sally, we are compelled to vacate that judgment of guardianship as to both parents. In addition, because the Division has failed, after almost six years, to identify any resource likely to afford permanency for Sally, and because the proofs on the third and fourth prongs as to Peter were so profoundly deficient, our remand is not for a new trial but requires the reopening of the Title Nine litigation.

I.

We derive the following facts from the trial record before us.[3] DYFS first became involved with this family on March 21, 2006, when Laura and her newborn baby, T.M. (Terry), who is not a party to this litigation, tested positive for marijuana shortly after Terry's birth. Laura was offered services and evaluations, but failed to follow through voluntarily. On April 2, 2007, the Division commenced an action for the care and supervision of Terry and Laura's other two children, Martin and Sally, under Title Thirty of the New Jersey statutes, *N.J.S.A.* 30:4C–1 to 30:4C–40. At the hearing on the Division's order to show cause, Laura was present with counsel but Peter was incarcerated and did not appear.

---

[3] This matter began with a Title Thirty complaint for care and supervision, followed by a Title Nine abuse and neglect proceeding, then, the first guardianship trial, the second Title Nine proceeding and finally, the second guardianship trial. Although all transcripts have been provided, several orders were not. When we requested certain orders, we were told they were in the Office of Parental Representation "archive." The orders have not been provided.

On the next court appearance, April 16, 2007, the deputy attorney general (DAG) informed the court that Peter was incarcerated in Trenton, but he was not produced. Laura agreed to comply with services and a fact-finding hearing was scheduled for August 6, 2007. On that date, in lieu of a hearing, Laura stipulated that her use of drugs and failure to follow through with services placed her children at risk of harm. Laura had submitted to a psychological evaluation and the psychologist felt the children would be at risk if they remained in Laura's custody. The DAG informed the judge that the Division would apply for custody on the next court date. Peter had been assigned counsel, but again he was not produced. His attorney informed the judge that Peter would be moving to a halfway house, and the judge indicated that Peter should attend the next court appearance.

On November 14, 2007, the Division sought custody of the three children. By then, Peter had been transferred to a halfway house, but did not appear for the hearing. At the conclusion of the hearing, the judge granted the Division's application for custody.

On February 11, 2008, both Laura and Peter appeared, but Peter's counsel was before another judge and the court proceeded without him. The DAG reported that Martin and Terry had been placed in the same foster home and Sally had been placed with a paternal relative.

At a compliance review on May 12, 2008, Peter appeared with counsel for the first time since the litigation began. The DAG noted that both Peter and Laura had submitted to psychological evaluations and the Division was "extremely pleased" with the progress that Laura had made. The Division recommended transition of the children for reunification with Laura, subject only to her obtaining appropriate housing. Although Peter was still in a halfway house, the DAG reported that he was following through on recommendations made by the psychologist and "working to address his parenting deficiencies." The judge indicated that if the halfway house did not transport Peter to the next appearance, the court would produce him.

A permanency hearing was held on August 7, 2008, and DYFS recommended a goal of reunifying the children with Laura. Peter had been removed from the halfway house for violating their policies and returned to the correctional institution. He was not produced for the hearing.

On November 10, 2008, Laura failed to attend a compliance review. The DAG reported that Laura remained unemployed and had not obtained housing. Peter again was not produced and his counsel failed to appear.

In January 2009, Peter was released from prison. On March 19, 2009, the court held a compliance review. Both Laura and Peter appeared with their attorneys. The DAG reported that Laura was non-compliant and requested a new permanency hearing as the Division no longer supported reunifying the children with her. Peter initially offered himself as a resource for Sally and the court ordered an updated psychological evaluation of him, a urine screen and a home inspection of Peter's uncle's residence, where he was temporarily residing.

On May 11, 2009, a permanency hearing was held and the judge approved the Division's plan to change the permanency goal for all three children from reunification to termination of parental rights followed by adoption. The DAG reported that Peter had submitted to an updated psychological evaluation but claimed he had "a long way to go" before he could be considered for placement of his daughter, citing "severe parenting deficits" and "antisocial behavior."

DYFS filed a guardianship complaint on June 22, 2009, seeking the termination of Peter's parental rights to Sally and Laura's rights to Martin, Sally and Terry. On July 8, 2009, Laura gave birth to Norman, and on July 17, 2009, the Division was granted custody of him.

The first guardianship trial began on January 27, 2010, and Laura executed an identified surrender of her parental rights of

Terry to the child's foster parents. The trial continued as to Martin and Sally for seven days over the course of four months.

On May 26, 2010, the judge rendered an oral decision finding that, as to Laura, DYFS had not met its burden by clear and convincing evidence under the four-pronged best interests test. In the judge's decision, only Laura was discussed. Not until the end of the proceedings was Peter even mentioned. The judge explained that since he was dismissing the guardianship complaint, he was declining to make any findings as to Peter. The judge indicated that he was ordering the reopening of the Title Nine litigation and requiring services for the defendants.

Even though Peter was represented by counsel during the initial care and supervision litigation, the subsequent Title Nine litigation, and throughout the guardianship trial, he apparently did not fill out the paperwork, commonly known as Form 5a, which was necessary for his appointed counsel to continue to represent him. As a result, Peter remained unrepresented over the next ten months until March 7, 2011, when the Division filed the second complaint for guardianship and the judge terminated the Title Nine litigation. During this period, Peter continued his visits with Sally, which were supervised by the Division. He also obtained housing and employment as a mechanic.

Another permanency hearing was held on October 15, 2010. Although Sally's placement and permanency were discussed, Peter had not been assigned counsel and was not present. The DAG indicated that Sally wanted to be reunited with her mother, and since Laura had successfully completed a substance abuse treatment program and found employment as a home health aide, the Division supported reunification of Sally with Laura, but sought termination of her parental rights as to Norman. Peter was never mentioned during the proceeding.

At the next permanency hearing, on January 24, 2011, Peter again was not present. The DAG reported that, although Laura had not tested positive for any illicit substances, she was again unemployed. The judge approved a permanency plan of termi-

nation of parental rights followed by adoption for both Martin and Sally. On March 7, 2011, the Division filed an amended guardianship complaint seeking to terminate the parental rights of Martin, Sally, and Norman.

The second guardianship trial began on September 21, 2011. Peter again was represented. DYFS called Dr. Robert Kanen, a clinical psychologist, who conducted interviews and bonding evaluations of Laura, Peter, and the children, at the request of DYFS. As to Laura, Dr. Kanen found "serious parenting deficits and that she would not be able to provide a permanent safe and secure home over an extended period of time or, you know, for a brief period of time." During a bonding evaluation, Norman avoided Laura and was afraid of her. Dr. Kanen concluded that Norman would not suffer any harm if Laura's parental rights were terminated.

Dr. Kanen also noted that Norman's current caretakers had already adopted Norman's sister, Terry, and that they were interested in adopting Norman as well. Dr. Kanen concluded that Norman had formed a secure attachment with his foster parents and would suffer serious harm if separated from them.

Dr. Kanen evaluated Peter, who expressed a desire to provide for Sally. Dr. Kanen testified that Peter's mental status was normal and he saw no evidence of drug or alcohol abuse, but found that Peter lacked an understanding of Sally's disabilities. Dr. Kanen diagnosed Peter with features associated with antisocial personality disorder as a result of his conviction and incarceration. Dr. Kanen also noted that, while he was incarcerated, Peter was not available to provide for Sally.

Dr. Kanen reported that during a bonding evaluation, Sally addressed Peter as "daddy" and told him she was having fun playing with him but was angry that he missed their last visit. At the end of the evaluation, Sally hugged Peter and gave him a kiss. Dr. Kanen concluded that Peter would have "great difficulty" parenting Sally because of her special needs, and that Sally would not suffer serious harm if Peter's parental rights were terminated.

Sally was very affectionate with Laura during their bonding evaluation, addressing her as "mommy." Laura interacted appropriately and was attentive to Sally, displaying "maternal warmth." When Laura discussed the recent death of her brother, whom Sally knew and liked, Sally's mood shifted dramatically from elevated to somber, and the child sought comfort with her mother. Sally rested her head on Laura's lap and fell asleep there while her mother comforted her. Dr. Kanen saw this as evidence that Sally was attached to Laura, but viewed the attachment as insecure due to the inconsistency of care provided by Laura. Dr. Kanen found Sally to be much more comfortable with her mother than with her foster parents and concluded that Sally would suffer harm if Laura's parental rights were terminated and "she would be very prone to become depressed."

On cross-examination, Dr. Kanen conceded that Sally's foster parents were no longer interested in adopting her and that the child had recently attempted suicide. Dr. Kanen also conceded that Peter could improve his attachment with Sally.

DYFS next called Kevin Belli, the adoption specialist who was working to find permanent placements for Norman, Martin, and Sally. Belli testified that the foster family that adopted Terry was interested in adopting Norman and Belli expressed hope that the family would agree to adopt Martin as well. Belli also testified that Sally's foster parents were no longer committed to adopting her, although they had not yet requested her removal.

On November 9, 2011, the trial judge read an oral decision, finding that the Division proved by clear and convincing evidence each of the four prongs of the best interests test, contained in *N.J.S.A.* 30:4C–15.1(a), as to both defendants.

The judge addressed the proofs as to Laura first, and found the "touchstone" of the case was her refusal to enter a residential treatment facility in Jersey City with the children. The judge found that Laura did not want to go to the facility because Jersey City was "too far" from where she was living. The judge viewed this as an indication that Laura rejected an opportunity to be

placed with her children. The judge noted that Laura began using drugs when she was sixteen, and while she had periods when she was able to stay drug free, "she always goes back." The judge concluded that Laura had not looked for suitable housing, had not looked for a job, and had not addressed her drug problem.

As to the second prong, the judge found that Laura was unwilling to eliminate the harm to the children and unwilling to provide a safe and stable home for them. The judge also found that the delay of permanent placement will add to the harm the children have already suffered.

As to the third prong, the court concluded that the Division had provided reasonable and appropriate services to Laura and had considered alternatives to termination. The judge noted that the foster family who adopted Terry was committed to adopting both Norman and Martin. As for Sally, the judge concluded that "adoption is the only feasible alternative at the present time."

As to the fourth prong, the judge accepted Dr. Kanen's conclusions that the bond between Norman and Laura was "severely impaired due to [Laura's] unavailability to parent and the intrusion of her psychological problems into the parent/child relationship." Based on Dr. Kanen's findings, the judge concluded that Norman would not suffer serious and enduring harm if permanently separated from Laura.

The court conceded that Sally had a bond with her mother and would suffer a "grief reaction" if Laura's parental rights were terminated, but found that termination of parental rights will give her the opportunity to be adopted and obtain permanency under the selective home adoption process.

The judge made similar fourth prong findings as to Martin, concluding that he was bonded to Laura but she was unable to safely and securely parent him due to her cognitive and emotional disabilities. It would, therefore, be in Martin's best interests to be freed for adoption.

As to Peter, the court found that his incarceration harmed Sally as he was "unavailable to nurture and provide parental care" to her. The court noted that Peter was in prison for Sally's birth and he never made an attempt to participate in her life. The court also found that Peter had a high potential for recidivism and, based on this alone, concluded that there would be great potential risk to Sally.

The judge found that the second prong was proven because Peter's plan for raising Sally was to have her move in with him and his girlfriend, with the girlfriend performing most of the custodial parenting tasks while Peter worked. However, the girlfriend indicated that these parenting responsibilities were likely beyond her capabilities as a result of Sally's psychological issues. The court also found that Peter did not have an adequate understanding of Sally's developmental needs.

As to the third prong, the judge conceded that the only service provided to Peter by the Division was supervised visitation with Sally. The judge found this adequate to satisfy the third prong, because Peter was not in need of any other services:

> There was no issue with respect to any other services that were referred to [Peter]. He—having demonstrated that he had a job and was in a permanent residence with this girlfriend.

The conclusion that Peter did not require services is in stark contrast to the judge's limited fourth prong analysis. Relying on Dr. Kanen's testimony, the judge found that Peter "did not have the capacity to parent because of his cognitive limitations."

The judge also relied on Dr. Kanen's evaluation in concluding that there would be no harm if Peter's parental rights were terminated, because Sally and Peter had no relationship, despite the fact that she calls him "daddy."

Based upon these findings, the court concluded that the Division proved all four prongs as to both parents and all three children, and terminated the parental rights of both defendants.

This appeal followed. Laura challenges the proofs as to the first and fourth prongs and maintains the Division failed to

consider alternatives to termination. Peter contends the trial court erred in finding the Division made reasonable efforts under the third prong and that termination of his parental rights to Sally will not do more harm than good under the fourth prong. The Law Guardian argues that the trial court's decision should be affirmed as to Martin and Norman but contends that the Division failed to prove prong four as to Sally.

## II.

"The right of parents to raise their children is a fundamental one of constitutional magnitude." *N.J. Div. of Youth & Family Servs. v. G.L.*, 191 *N.J.* 596, 605, 926 *A.2d* 320 (2007). That right, however, is not without limits. *In re K.H.O.*, 161 *N.J.* 337, 346–47, 736 *A.2d* 1246 (1999). Rather, the parents' rights must be balanced against the State's parens patriae responsibility to protect the welfare of children. *In re Guardianship of J.C.*, 129 *N.J.* 1, 10, 608 *A.2d* 1312 (1992). "[P]resumptions of parental unfitness may not be used in proceedings challenging parental rights and all doubts must be resolved against termination." *G.L.*, *supra*, 191 *N.J.* at 606, 926 *A.2d* 320.

Termination actions are decided under a four-prong "best interests of the child" standard, first enunciated by the Court in *N.J. Div. of Youth & Family Servs. v. A.W.*, 103 *N.J.* 591, 604–11, 512 *A.2d* 438 (1986), and now codified in *N.J.S.A.* 30:4C–15.1(a). Under that standard, parental rights may be terminated only when:

(1) The child's safety, health or development has been or will continue to be endangered by the parental relationship;

(2) the parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm. Such harm may include evidence that separating the child from his resource family parents would cause serious and enduring emotional or psychological harm to the child;

(3) The division has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights; and

(4) Termination of parental rights will not do more harm than good.

"The four [prongs] enumerated in the best interests standard are not discrete and separate; they relate to and overlap with one another to provide a comprehensive standard that identifies a child's best interests." *K.H.O., supra,* 161 *N.J.* at 348, 736 *A.*2d 1246. Our task is "to determine whether the decision of the family court in terminating parental rights is supported by 'substantial and credible evidence on the record.'" *N.J. Div. of Youth & Family Servs. v. F.M.,* 211 *N.J.* 420, 448, 48 *A.*3d 1075 (2012) (quoting *N.J. Div. of Youth & Family Servs. v. M.M.,* 189 *N.J.* 261, 279, 914 *A.*2d 1265 (2007)).

"We accord deference to factfindings of the family court because it has the superior ability to gauge the credibility of the witnesses who testify before it and because it possesses special expertise in matters related to the family." *Ibid.* (citing *Cesare v. Cesare,* 154 *N.J.* 394, 413, 713 *A.*2d 390 (1998)). "It is not our place to second guess or substitute our judgment for that of the family court, provided that the record contains substantial and credible evidence to support the decision to terminate parental rights." *G.L. supra,* 191 *N.J.* at 605, 926 *A.*2d 320. "We will not overturn a family court's factfindings unless they are so 'wide of the mark' that our intervention is necessary to correct an injustice." *F.M. supra,* 211 *N.J.* at 448, 48 *A.*3d 1075 (quoting *G.L. supra,* 191 *N.J.* at 605, 926 *A.*2d 320). With these principles in mind, we address the issues raised on this appeal.

### III.

Laura argues that the court did not take note of the fact that it had previously found no harm or risk of harm to the children when it ruled after the first guardianship trial that the first prong had not been met. She also argues that the "law of the case doctrine" is a principle establishing that an "unreserved decision of a question of law or fact made during the course of litigation ... settles that question for all subsequent stages of the suit." *State v. Hale,* 127 *N.J.Super.* 407, 410, 317 *A.*2d 731 (App.Div.1974). Laura's argument that "no new facts have emerged" since the first

guardianship trial, where prong one was not met, is not supported by the record.

Caseworker Belli testified that, in 2011, Laura missed several visits with the children, failed to seek employment or suitable housing, and continued her drug use. Laura argues that since the same conditions existed two years ago, her continued failure to address these deficiencies does not constitute risk to the children based upon the "law of the case." We disagree.

*N.J.S.A.* 30:4C–15.1(a)(1) requires that DYFS prove by clear and convincing evidence that "[t]he child's safety, health or development has been or will continue to be endangered by the parental relationship." The focus of this prong "is on the effect of harms arising from the parent-child relationship over time on the child's health and development." *K.H.O., supra,* 161 *N.J.* at 348, 736 *A.*2d 1246. In order to satisfy this prong, DYFS need not "wait until a child is actually irreparably impaired by parental inattention or neglect[,]" *F.M., supra,* 211 *N.J.* at 449, 48 *A.*3d 1075 (internal quotation marks omitted) (citing *In re Guardianship of D.M.H.,* 161 *N.J.* 365, 383, 736 *A.*2d 1261 (1999)); rather, DYFS must demonstrate that the parental relationship has created a harm that "threatens the child's health and will likely have continuing deleterious effects on the child." *Ibid.* (quoting *K.H.O., supra,* 161 *N.J.* at 352, 736 *A.*2d 1246). Laura's continued drug use, lack of appropriate housing, and failure to attend treatment clearly posed a risk to the children.

Laura next argues that the proofs under the third prong were insufficient. She does not argue that the Division failed to provide adequate services to help her reunite with her children. Rather, she claims that DYFS did not search out family members, assess them all, and send rule-out letters to all those found to be inappropriate. Further, she claims that a particular willing caregiver, Ms. Lewis, was ignored.

The third prong of the "best interest" standard requires DYFS to prove, by clear and convincing evidence, that it "made reason-

able efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights." *N.J.S.A.* 30:4C–15.1(a)(3).

The Division made efforts to find appropriate placements for all of the children. Norman and Martin are currently placed in a pre-adoptive foster home. While Sally's current foster parents (the Johnson family) are not now willing to adopt her, this is not due to lack of effort on the part of the Division. The record indicates that these foster parents were initially willing to adopt Sally, until it became apparent that they were unable to address Sally's very significant disabilities.

As to Ms. Lewis, who was proposed by Laura, the Division gave her every opportunity to have the children placed with her. While Ms. Lewis began to fulfill some of the requirements for certification as a caregiver, her attendance at the PRIDE [4] foster parent training program was inconsistent and eventually ceased. Both Ms. Lewis and Laura were informed that Ms. Lewis would have to complete the PRIDE program in order to be considered for placement. She failed to attend visits with the children and was eventually informed that Sally could not be placed with her at that time. The trial judge properly found the third prong was established as to Laura.

We will address Peter's third prong challenge, then, the arguments of both defendants as to the fourth prong. Peter contends that the Division did not provide him with reasonable services in which to bond with Sally, including visitation. In determining whether the Division made reasonable efforts as to Peter, we must examine the entire record.

When the Division sought care and supervision of the children on April 2, 2007, Peter was incarcerated. When the judge inquired as to what efforts had been made to notify the fathers of

---

[4] Parent Resources for Information, Development, and Education.

the three children, the DAG replied that DYFS had "almost no information" as to the fathers. Laura then volunteered that Peter's family members had come to court and were outside the courtroom. The judge directed the Division to make inquiries of the family members to ascertain Peter's whereabouts.

On the next court appearance, the DAG informed the court that Peter was incarcerated in Trenton, but he was not produced. Even though the judge directed that Peter be produced for the next court appearance, that was not done.

By November 14, 2007, when the Division sought custody of the children, including Peter's daughter Sally, Peter had been transferred to a halfway house, but no effort was made to produce him for that hearing. Although counsel had been appointed for Peter, his attorney also failed to appear. The only mention of Peter came at the conclusion of the hearing when the DAG mentioned that Peter was in a halfway house and was "supposed" to be there. As to the absence of Peter's counsel, the DAG noted that Peter was previously represented by two attorneys and stated, "I don't know why they're not here." The judge made no inquiry as to why Peter's counsel was not present and it does not appear from the record that any attempt was made to contact either of them.

Although Peter appeared at the next conference on February 11, 2008, his attorney was again not present. The judge was informed that Peter's attorney was in the courthouse, appearing before another judge. However, the judge again made no effort to contact the attorney or ascertain if he could be present. Instead, the judge proceeded with the compliance review without Peter's counsel, explaining, "[Peter's counsel] might be coming down later. I can't wait, I have other stuff we have to do."

By August 7, 2008, when a permanency hearing was held, Peter had been removed from the halfway house and returned to the correctional institution. Again, he was not produced for this critical proceeding.

On November 10, 2008, Peter was not produced and his attorney failed to appear for a compliance review. The judge made no inquiry as to why Peter and his counsel did not appear and Peter was never even mentioned during the proceeding.

While it is the Division's responsibility to locate and serve all parties to Title Nine and Title Thirty matters, the court cannot sit idly by when the Division fails repeatedly to make any effort to produce an incarcerated parent. In the case of an inmate in a county or state institution, court personnel have the ability to identify and locate these inmates, and the court has the authority to produce the inmate through a writ or order to produce. *See, N.J.A.C.* 10A:3–9.6.

The due process deficiency of failing to produce Peter at several critical proceedings involving his child was compounded by the judge's failure to make the slightest effort to have Peter's counsel present. While we are mindful of the heavy calendars our trial courts deal with, we find it inexcusable that the judge made no effort to have Peter's counsel appear, especially when it was known that the attorney was in the courthouse appearing before another judge.

 The right to custody of one's children and the protection of the integrity of the family from arbitrary governmental action is a fundamental constitutional right. *Stanley v. Illinois,* 405 *U.S.* 645, 92 *S.Ct.* 1208, 31 *L.Ed.*2d 551 (1972). Both the statutory law and the case law of this State suggest that a defendant has a right to counsel when a complaint is filed against him or her charging abuse and neglect and threatening the individual's parental rights. *N.J.S.A.* 9:6–8.43(a) provides that indigent parents or guardians may apply to have counsel appointed to represent them at Title Nine proceedings:

> [t]he court shall advise the parent or guardian of his right to have an adjournment to retain counsel and consult with him. The court shall advise the respondent that if he is indigent, he may apply for an attorney through the Office of the Public Defender.

If the right to counsel to protect this constitutional right is to be effective, then the right must exist not only at the trial itself but at all critical stages after formal proceedings have begun. *See Brewer v. Williams,* 430 *U.S.* 387, 97 *S.Ct.* 1232, 51 *L.Ed.*2d 424 (1977); *Powell v. Alabama,* 287 *U.S.* 45, 53 *S.Ct.* 55, 77 *L.Ed.* 158 (1932). To proceed with a hearing, as the judge did on February 11, 2008, without Peter's counsel, knowing that the attorney was in the courthouse before another judge, denied Peter this fundamental right.

In January 2009, Peter was released from prison. Other than supervised visitation, he was provided with no services until the guardianship complaint was filed on June 22, 2009.

At the first guardianship trial, Dr. Barry Katz testified on behalf of Peter. While Dr. Katz admitted that there was no current bond between Peter and Sally, he testified that, with effort, a bond could be established between them. When Peter offered himself as a resource for Sally, the Division relied on the deficiencies noted in Dr. Kanen's psychological evaluation to argue that he was not a fit placement. No services were offered to address the "severe parenting deficits" and "antisocial behavior" which were noted in Dr. Kanen's evaluation. The antisocial behavior refers to Peter's drug-dealing for which he served a prison sentence. Parenting defects, as referenced by Dr. Kanen, are commonly addressed with services such as counseling, therapy and therapeutic visitation. Even though the need for these services was apparent, none were offered to Peter.

We acknowledge that "where one parent has been the custodial parent and takes the primary or dominant role in caring for the children, it is reasonable for DYFS to continue to focus its efforts of family reunification on that custodial parent...." *D.M.H., supra,* 161 *N.J.* at 393, 736 *A.*2d 1261. However, these efforts must not ignore or exclude the non-custodial parent. *Ibid.* Here, the Division's efforts were focused entirely on reunifying Laura with her children. Peter was not produced from prison for several proceedings during the initial care and supervision and

Title Nine litigation. As a result, he missed critical events affecting his child such as the initial application for custody, a fact-finding hearing, and a permanency hearing. From the time DYFS initiated litigation, it took over one year for Peter and his attorney to appear together at a court proceeding.

After the first guardianship trial, the judge restored the Title Nine litigation. This should have been an opportunity for both parents to work toward reunification. However, the Division again focused its resources almost exclusively on Laura, offering her group counseling, parenting skills classes, substance abuse evaluations and treatment, and even an opportunity to obtain a general education diploma.

Peter apparently neglected to fill out the paperwork [5] to have his attorney reappointed to represent him in the re-opened Title Nine litigation. The record is not clear how this happened. We find it troubling that neither the judge nor the DAG ever acknowledged, let alone addressed, Peter's absence when the Title Nine litigation was reinstated. Peter was consistent in his attendance in the initial care and supervision matter, the subsequent Title Nine litigation and the guardianship trial. He was represented throughout these three proceedings and gave no indication that he wished to discontinue his representation. His attendance alone at the post-dismissal visitations with Sally should have alerted the Division and the judge as to Peter's continuing interest in providing for Sally. The record is devoid of any reference by the court or the DAG as to why Peter was not represented and did not participate when the Title Nine litigation was restored.

Although the Division provided visitation to Peter, it was not the type recommended by Dr. Katz, who testified that therapeutic visitation would provide Peter the benefit of a professional to

---

[5] When parents in a Title Nine or Title Thirty matter seek appointment of counsel, the parents must fill out a form demonstrating that they are indigent and qualify for appointed counsel. This form, known as Form 5A, must be filled out separately for each matter.

assist him in addressing Sally's mental health issues. No services other than visitation were offered to Peter from the time the first guardianship complaint was dismissed and the filing of the second guardianship complaint, ten months later.

In the court's findings as to prong three, the judge concluded that Peter did not have "an adequate understanding of the developmental needs of his child" and was "not adequately aware of or sensitive to this child's bipolar disorder, hyperactivity disorder or academic delays." However, the Division had access to all of Sally's evaluations, her Individualized Education Program (IEP), and her medical records. Under *N.J.S.A.* 30:4C–15.1(c), the Division had an obligation to inform Peter "at appropriate intervals of the child's progress, development and health." This was never done. When Dr. Kanen was asked on cross-examination whether he discussed Sally's special needs with Peter, he responded, "I'm not necessarily there to educate him … about his daughter's … problems." Had the Division complied with the provisions of *N.J.S.A.* 30:4C–15.1(c)(3), Peter would have been given the opportunity to learn about Sally's special needs, her disorders and delays.

In view of the failure of the Division to provide these necessary services to Peter, the trial court erred in finding that DYFS proved the third prong by clear and convincing evidence as to him.

Peter argues that the Division did not prove that more harm than good would come to the child if Peter's parental rights were terminated. The judge began his decision by noting that the first trial resulted in the dismissal of the guardianship complaint due to a "lack of permanency" for Martin and Sally. While Martin's permanency prospects have improved, Sally is no closer to permanency now than she was after the first trial. Any analysis under the fourth prong must necessarily include a discussion of a child's prospects of permanency as terminating parental rights without any compensating benefit, such as adoption, may do great harm to a child. *A.W., supra,* 103 *N.J.* at 610–11, 512 *A.2d*

438. Thus, we recount the lengthy history and numerous difficulties of Sally's placements.

When Sally was first removed from Laura, at age five, she was placed with a paternal relative who was not willing to adopt. During the first guardianship trial, the judge noted that twenty-seven months had elapsed since the children were initially removed, and there were no options for permanent placement for any of them. The judge also suggested that Sally may have regressed as a result of the removal and her subsequent placement:

> What have we done to alleviate the disabilities in terms of placement? We're working on it 27 months later. Maybe that's why—maybe that's why the child [Sally] reacts the way she does. Maybe what we have done to her by this removal and leaving her in foster placement for all this time is to cause her serious psychological disturbance. And, maybe every day that we [continue] her—we leave her there, we [continue] to harm this child.

Later in the trial, the DAG advised the judge that Sally had just been placed in a foster home where the caregivers wished to adopt her. Peter's counsel expressed surprise and some skepticism as Sally had previously been placed with Peter's cousin, and Peter was hopeful that his daughter would eventually be placed with him. Peter's counsel asked for some proof that the foster family actually intended to adopt Sally:

> Judge, I—we're hearing for the first time that [Sally] is going to be adopted. And, of course, we have nothing to go by other than what the Division is stating. I would ask—I think it would benefit all of us, even the Court, if we could have some proof that that's the actual case. It seems a little bit unusual. The child has just been placed with someone. And right off the bat, this family or person wants to adopt. It's just—it's not the way things usually work. I haven't seen it. It may be in this case, but it's—it's just a little bit questionable, with all due respect.

Shortly after her placement with this family, Sally began to act out and the foster parents expressed reservations about keeping, let alone, adopting her. On June 2, 2010, less than five weeks after her placement, the foster parents requested that Sally be removed from their home because of her behavior.

Sally was then placed with the Johnson family in a therapeutic foster home. The Johnsons were extraordinarily attentive to Sally's social, educational and medical needs, and Sally began to

thrive in their care. Even though the Johnsons were not considered a "pre-adoptive" placement, by February 2011, the Johnsons told the caseworker they were considering adopting Sally. In April 2011, they obtained a passport for Sally and took her on vacation to Jamaica. Sally began to refer to Mrs. Johnson as her "mom" and told the caseworker she wanted to be adopted by the Johnsons. The monthly reports filed by the caseworker were glowing and indicated that Sally was overjoyed with this placement.

Shortly thereafter, Sally began to experience behavioral problems in school. Mrs. Johnson described Sally as "out of control" at school, throwing books and disrupting the class.

By June 2011, Sally's behavior worsened. Mrs. Johnson was called to pick Sally up from school after she was "going crazy," hitting teachers and rolling on the ground, hitting herself. Mrs. Johnson took Sally to a local hospital where she was evaluated. Sally's school informed Mrs. Johnson that she would have to find another school for Sally.

In July, the Johnsons took Sally on vacation to Canada. When they returned, Mrs. Johnson found another school willing to accept Sally and implement her IEP. Mrs. Johnson took Sally back to her psychiatrist to adjust the numerous medications she took, but the child's behavior continued to worsen.

On July 21, 2011, the Johnsons admitted Sally to the psychiatric unit of a local hospital after she tried to kill herself by eating carpet freshener and threatening to jump off a second floor balcony. Sally was released after eight days and returned to the Johnsons, but by the end of August 2011, the Johnsons began to express reservations about adopting Sally. Ultimately they decided not to adopt her.

Although the trial court never mentioned it, Sally enjoyed spending time with Peter and was upset when he missed a visit. After the filing of the second guardianship complaint, the Division engaged Dr. Thomas Page, Ph.D., to provide family counseling. In a report dated May 4, 2011, Dr. Page indicated that, although

Sally's behavior over the past month had been unstable, she was making slow progress and her behavior improved when she was around her father. Dr. Page explained that "[Peter] sits with [Sally] and does various activities with her to keep her active and remain focused." Dr. Page discussed how both parents acted when they visited Sally:

> The father was always present and arrived before time to obtain the full visit. He was alert and active through all of the sessions. The mother would come late throughout the whole month with the exception of one time.

Sally's special needs are considerable. If Sally is removed from the Johnson home, which appears likely, it will be her fourth removal since 2007. Research has shown that multiple foster placements have been linked to increased behavioral problems in those children, and children in foster care who are subject to placement instability, experience a significant impact on their behavioral well-being. Rubin, et al., *The Impact of Placement Stability on Behavioral Well-being for Children in Foster Care*, 119 American Academy of Pediatrics, No. 2, February 2007. The detriment caused by cycling a child through multiple placements may be greater than keeping the parent-child relationship intact since "the child's psychological and emotional bond to the parent may have been broken with nothing substituted in its place." *A.W., supra*, 103 *N.J.* at 611, 512 *A.*2d 438 (quoting *In re Angelia P.*, 28 *Cal.*3d 908, 171 *Cal.Rptr.* 637, 623 *P.*2d 198, 210 (1981) (Bird, C.J., concurring and dissenting)).

 Sally is almost eleven years old and has been out of home placement since she was five. While the DYFS caseworker testified that the Division has had success in placing children with disabilities who have subsequently been adopted, Sally's age,[6] the severity of her psychiatric disabilities and her extreme behavioral disorders, militate strongly against her prospects of achieving permanency. "Termination of parental rights does not always

---

[6] The age of a child is a strong factor in adoption. One study showed a higher percentage of children nine and older waiting for adoption while children who were removed before age eight enjoyed a dramatic decline in time to adoption.

result in permanent placement of the child" and "too many children 'freed up' for adoption do not in the end find permanent homes." *J.C., supra,* 129 *N.J.* at 21, 608 *A.*2d 1312.

Although Peter is not without his parental flaws, he has maintained a consistent interest in providing for Sally since his release from prison. He is gainfully employed, has adequate housing, a stable home life and does not suffer any substance abuse problems. Peter has attended court proceedings, visitations and submitted to evaluations and testing whenever asked by the Division. Caseworker reports indicate that although he occasionally missed visits with Sally, he was far more consistent than Laura, which was not lost on Sally. In seeking to terminate the parental rights of Laura and Peter, the Division is promising only the possibility, unlikely though it may be, that Sally may be adopted. Given Sally's bleak prospects for adoption, the termination of her parental rights does not appear to have any real compensating benefit.

The trial court based its entire prong-four analysis on the testimony and report of Dr. Kanen, concluding that Peter did not have the capacity to parent and had no relationship with Sally. The visitation reports and the observations of Dr. Page do not support either of these conclusions. Moreover, the judge's decision ignored the three failed placements that Sally has already endured, her significant disabilities and the Division's inability to find a permanent placement for her almost six years after her initial removal.

Because we find that the Division failed to prove that termination would not do more harm than good to Sally by clear and convincing evidence, we reverse the order terminating parental rights as to Sally.

On remand, the Title Nine litigation will be restored as to both parents. The judge shall insure that both defendants are represented and, if either is indigent, counsel must be appointed.

Penelope L. Maza, *A New Look at the Role of ASFA and Children's Ages in Adoption,* 23 The Roundtable, No. 1, 2009, at 2.

We note that the one-hour per week supervised visits offered by DYFS did not afford either parent a meaningful opportunity to cultivate a relationship with Sally. *See N.J. Div. of Youth & Family Servs. v. I.S.*, 202 *N.J.* 145, 180, 996 *A.*2d 986 (2010). On remand, the court should review the visitation opportunity afforded to each parent to determine whether DYFS is facilitating appropriate visitation as required by *N.J.S.A.* 30:4C–15.1(c)(4). Among the items to be included in that review, the court should consider: whether visits are sufficiently frequent to foster the development of a bond between parent and child; Dr. Katz's recommendation that Peter be afforded therapeutic visitation; and whether there is a "need" for Peter's visits to be supervised. *See N.J.A.C.* 10:122D–1.10(b).

The judgment terminating Laura's parental rights to Martin and Norman is affirmed. The judgment terminating the parental rights of Laura and Peter to Sally is vacated, and the case is remanded to the trial court for the immediate development and implementation of a reasonable, realistic and meaningful reunification plan consistent with this opinion. Jurisdiction is not retained.