RECORD IMPOUNDED

 NOT FOR PUBLICATION WITHOUT THE
 APPROVAL OF THE APPELLATE DIVISION
 This opinion shall not "constitute precedent or be binding upon any court."
 Although it is posted on the internet, this opinion is binding only on the
 parties in the case and its use in other cases is limited. R.1:36-3.

 SUPERIOR COURT OF NEW JERSEY
 APPELLATE DIVISION
 DOCKET NO. A-3266-15T1

NEW JERSEY DIVISION OF CHILD
PROTECTION AND PERMANENCY,

 Plaintiff-Respondent,

v.

T.N.,

 Defendant-Appellant,

and

C.L. (deceased),

 Defendant.
___________________________________

IN THE MATTER OF THE
GUARDIANSHIP OF L.L., a minor.

___________________________________

 Submitted March 14, 2017 – Decided April 18, 2017

 Before Judges Fisher and Leone.

 On appeal from Superior Court of New Jersey,
 Chancery Division, Family Part, Ocean County,
 Docket No. FG-15-36-15.

 Joseph E. Krakora, Public Defender, attorney
 for appellant (Gilbert G. Miller, Designated
 Counsel, on the briefs).
 Christopher S. Porrino, Attorney General,
 attorney for respondent (Melissa H. Raksa,
 Assistant Attorney General, of counsel; Angela
 Melchionna, Deputy Attorney General, on the
 brief).

 Joseph E. Krakora, Public Defender, Law
 Guardian, attorney for minor (Nancy P. Fratz,
 Assistant Deputy Public Defender, on the
 brief).

PER CURIAM

 Defendant T.N. (Mother) appeals the March 24, 2016 order

terminating her parental rights.

 I.

 We summarize the factual findings made by Judge Madelin F.

Einbinder in her March 24, 2016 oral opinion.

 Mother has three children from two different fathers. L.L.,

her youngest child and the sole subject of this termination

proceeding, was born in May 2009. In May 2014, L.L.'s father,

C.L., passed away of a heroin overdose. Mother's oldest child,

B.N., died due to a heroin overdose in June 2014. Her other child,

J.N., currently resides with the parents of his father in South

Carolina under kinship legal guardianship.

 The Division of Child Protection and Permanency (Division)

first became involved with Mother's family in November 2004.1 It

1 At that time, the Division was known as the Division of Youth
and Family Services. It was renamed effective June 29, 2102. L.
2012, c. 16.

 2 A-3266-15T1
is undisputed that during the following years Mother drank heavily,

became dependent on oxycodone, was declared disabled due to her

bipolar disorder, took prescription opiates without a

prescription, and repeatedly refused to engage in services offered

by the Division. Ultimately, in December 2013, the trial court

granted the Division custody of L.L. due to Mother's continuing

substance abuse.

 During 2014, Mother continued to test positive for cocaine,

amphetamines, marijuana, and alcohol, and repeatedly refused to

engage in or comply with substance abuse and mental health

services. In December 2014, the Division filed a Complaint for

Guardianship.

 At the termination trial in early 2016, the Division presented

the testimony of two caseworkers and its psychological expert, Dr.

David Brandwein. Based on that testimony, Judge Einbinder found

that Mother's parental rights should be terminated, and that L.L.'s

adoption by his paternal grandparents was in his best interest.

Mother appeals.

 II.

 We must hew to our deferential standard of review. "Appellate

review of a trial court's decision to terminate parental rights

is limited[.]" In re Guardianship of J.N.H., 172 N.J. 440, 472

(2002). Our task is to determine whether the decision "is

 3 A-3266-15T1
supported by '"substantial and credible evidence" [i]n the

record.'" N.J. Div. of Youth & Family Servs. v. F.M., 211 N.J.

420, 448 (2012) (citation omitted). "We ordinarily defer to the

factual findings of the trial court because it has the opportunity

to make first-hand credibility judgments about the witnesses who

appear on the stand; it has a 'feel of the case' that can never

be realized by a review of the cold record." N.J. Div. of Youth

& Family Servs. v. E.P., 196 N.J. 88, 104 (2008) (citation

omitted). "Particular deference is afforded to family court fact-

finding because of the family courts' special jurisdiction and

expertise in family matters." N.J. Div. of Child Prot. &

Permanency v. N.C.M., 438 N.J. Super. 356, 367 (App. Div. 2014)

(citing Cesare v. Cesare, 154 N.J. 394, 413 (1998)), certif.

denied, 222 N.J. 18 (2015). Thus, "[w]e will not overturn a family

court's factfindings unless they are so '"wide of the mark"' that

our intervention is necessary to correct an injustice." F.M.,

supra, 211 N.J. at 448 (citation omitted).

 III.

 "A parent's right to enjoy a relationship with his or her

child is constitutionally protected." In re Guardianship of

K.H.O., 161 N.J. 337, 346 (1999). However, this protection "is

tempered by the State's parens patriae responsibility to protect

the welfare of children." Id. at 347; see N.J.S.A. 30:4C-1(a).

 4 A-3266-15T1
 The Division must prove by clear and convincing evidence

termination of parental rights is in the best interests of the

child. N.J.S.A. 30:4C-15(c); F.M., supra, 211 N.J. at 447. Under

N.J.S.A. 30:4C-15.1(a), the Division must show:

 (1) The child's safety, health, or
 development has been or will continue to
 be endangered by the parental
 relationship;

 (2) The parent is unwilling or unable to
 eliminate the harm facing the child or
 is unable or unwilling to provide a safe
 and stable home for the child and the
 delay of permanent placement will add to
 the harm. Such harm may include evidence
 that separating the child from his
 resource family parents would cause
 serious and enduring emotional or
 psychological harm to the child;

 (3) The division has made reasonable efforts
 to provide services to help the parent
 correct the circumstances which led to
 the child's placement outside the home
 and the court has considered alternatives
 to termination of parental rights; and

 (4) Termination of parental rights will not
 do more harm than good.

 The trial court properly found the Division proved each prong

by clear and convincing evidence. We affirm substantially for the

reasons stated by Judge Einbinder in her thorough oral opinion.

We add the following.

 5 A-3266-15T1
 IV.

 The first two prongs, N.J.S.A. 30:4C-15.1(a)(1) and (2), are

related "components of the harm requirement." In re Guardianship

of DMH, 161 N.J. 365, 379 (1999). Because "evidence that supports

one informs and may support the other as part of the comprehensive

basis for determining the best interests of the child," ibid., we

address both prongs together. E.P., supra, 196 N.J. at 104.

 Mother's history of frequent substance abuse and unaddressed

mental health issues predated L.L.'s birth, and continued through

his early years until shortly before trial. There was substantial

credible evidence showing Mother's substance abuse and mental

illness caused L.L. significant harm. For example, when L.L. was

removed from Mother's custody, he was "much younger

developmentally and psychologically than he really was," was non-

verbal, and was still wearing diapers even though he was four-and-

a-half years old.

 Our Supreme Court has ruled that harm is shown "by indications

of parental dereliction and irresponsibility, such as the parent's

continued or recurrent drug abuse, the inability to provide a

stable and protective home, the withholding of parental attention

and care, and the diversion of family resources in order to support

a drug habit." K.H.O., supra, 161 N.J. at 353. Mother's chronic

substance abuse threatened obvious harm to the young L.L. N.J.

 6 A-3266-15T1
Div. of Child Prot. & Permanency v. B.O., 438 N.J. Super. 373, 385

(App. Div. 2014). Unabated substance abuse "causes continuing

harm by depriving . . . children of necessary stability and

permanency." N.J. Div. of Youth & Family Servs. v. T.S., 417 N.J.

Super. 228, 245 (App. Div. 2010), certif. denied, 205 N.J. 519

(2011). "[P]arents dabbling with addictive substances must accept

the mandate to eliminate all substance abuse." Ibid.

 In addition, Mother suffered from "unspecified bipolar and

related disorder, other specified personality disorder with

narcissistic, histrionic and personality features and unspecified

anxiety disorder." Her personality disorders caused her to "feel

like [she's] superior and . . . the center of attention" while

simultaneous causing her to have a complete lack of independence

and a desire to "depend on stronger people to help [her] and . . .

[primarily] worry about meeting [her] own needs." The trial court

properly found these conditions "place[d] a child at risk of harm

if untreated."

 Indeed, despite substantial disability benefits, Mother was

unable to maintain stable housing, or to pay for utilities or food

for her children. "[L]ack of appropriate housing . . . pose[s] a

risk to . . . children." N.J. Div. of Youth & Family Servs. v.

L.M., 430 N.J. Super. 428, 444 (App. Div. 2013). "[H]arm and risk

of harm [can be] proven [where] the parents' drug use resulted in

 7 A-3266-15T1
their failure to provide a stable home, with appropriate nurture

and care of the young child[.]" N.J. Div. of Youth & Family Servs.

v. H.R., 431 N.J. Super. 212, 222 (App. Div. 2013). Here, there

was ample evidence Mother's substance abuse and mental health

problems impaired her ability to parent, retarded L.L's

development, and required his removal from her care.

 The same evidence showed Mother was "unwilling or unable to

eliminate the harm facing the child [and was] unable or unwilling

to provide a safe and stable home for the child." N.J.S.A. 30:4C-

15.1(a)(2); see N.J. Div. of Youth & Family Servs. v. L.J.D., 428

N.J. Super. 451, 479 (App. Div. 2012). Dr. Brandwein cited the

two-year period of Mother's "pervasive," "enduring," indeed

"monumental non-compliance" with the substance abuse and mental

health services offered by the Division. Mother was negatively

discharged from multiple outpatient substance abuse treatment

centers, and Dr. Brandwein testified she largely failed to benefit

from the services she did attend. His testimony was unrefuted.

We agree "[t]here is ample evidentiary basis for crediting the

expert's conclusion[s]." K.H.O., supra, 161 N.J. at 356.

 Mother presented no testimony or evidence at trial, but makes

several arguments on appeal. Mother notes the trial court

mentioned the Division received twenty-one referrals between 2011

and 2013. She points out the Division did not substantiate her.

 8 A-3266-15T1
We agree unfounded allegations may not be used to support the

requisite findings. See N.J. Div. of Youth & Family Servs. v.

P.W.R., 205 N.J. 17, 36 & n.15 (2011). However, the court placed

little or no weight on the referrals. Further, there was ample

well-founded evidence of Mother's substance abuse and mental

disorders during this period and thereafter.

 Mother argues that her positive drug tests were for

prescription drugs. However, she repeatedly failed to provide

prescriptions, and admitted she took opiates without valid

prescriptions on numerous occasions. Moreover, Mother admitted

marijuana and alcohol use, and tested positive for cocaine and

marijuana in August and September 2014. She argues those positive

results were caused by the deaths of her former husband and her

eldest son, but those occurred months earlier.

 Mother cites her participation in substance abuse programs

and the lack of positive test results, between September 2014 and

April 2015. However, during this period her attendance at this

outpatient program was poor, she relapsed when she tested positive

twice for alcohol in April 2015, and she was discharged for non-

compliance.

 Mother stresses she attended an intensive five-days-a-week

combined substance abuse counseling and mental health treatment

program beginning in August 2015, and successfully completed the

 9 A-3266-15T1
program on January 29, 2016, approximately one week before the

termination trial began. She also obtained housing and a car.

Nonetheless, Dr. Brandwein evaluated Mother after this treatment

and found she still was not capable of independently parenting

L.L., and still posed "a rather high risk of child neglect." He

found the prognosis that Mother would become an appropriate parent

even after receiving services was "extremely poor." Nonetheless,

Mother was "in the infancy of her stability" and "to put [L.L.]

back into instability would be risking [L.L.'s] psychological and

physical well-being." He testified that before reunification

could be considered, Mother would need to demonstrate sobriety,

stable housing, consistent compliance with medication, and more

positive visitation with the child, for at least a year.

 Mother argues that she could meet Dr. Brandwein's

requirements if given another year, and that "a delay of permanency

of one year could hardly be harmful to [L.L.]." However, New

Jersey's courts and statutes recognize "the delay of permanent

placement will add to the harm." N.J.S.A. 30:4C-15.1(a)(2). "[T]o

the extent that adults . . . delay the permanent decision, they

lose sight of the child's concept of time." N.J. Div. of Youth &

Family Servs. v. A.W., 103 N.J. 591, 608 (1986). Courts have

"'long emphasized New Jersey's strong public policy in favor of

permanency.'" N.J. Div. of Youth & Family Servs. v. I.S., 202

 10 A-3266-15T1
N.J. 145, 197 (2010) (citation omitted). New Jersey has shifted

its "emphasis 'from protracted efforts for reunification with a

birth parent to an expeditious, permanent placement to promote the

child's well-being.'" Id. at 198 (citation omitted). "The child

should not 'languish indefinitely in foster care while a birth

parent attempts to correct the conditions that resulted in an out-

of-home placement.'" H.R., supra, 431 N.J. Super. at 227.

"Keeping the child in limbo, hoping for some long term unification

plan, would be a misapplication of the law." N.J. Div. of Youth

& Family Servs. v. A.G., 344 N.J. Super. 418, 438 (App. Div. 2001),

certif. denied, 171 N.J. 44 (2002).

 L.L. has waited over two years while Mother refused to engage

in substance abuse and mental health services. The trial court

credited Dr. Brandwein's testimony and properly held that while

Mother made recent efforts, she would not attain stability soon

enough to justify denying L.L. permanency. While Mother

commendably took positive steps at the eleventh hour, we cannot

fault the trial court's findings that her efforts were too little

and too late and that she cannot provide sufficient assurance of

the stability L.L. needs in the reasonably foreseeable future.

 11 A-3266-15T1
 V.

 Mother does not challenge the trial court's finding that the

Division made reasonable efforts to provide Mother with services

and met the third prong of N.J.S.A. 30:4C-15.1(a).

 VI.

 Prong four acts "as a fail-safe against termination even

where the remaining standards have been met." N.J. Div. of Youth

& Family Servs. v. G.L., 191 N.J. 596, 609 (App. Div. 2007). The

trial court must discern "'whether, after considering and

balancing the two relationships, the child will suffer a greater

harm from the termination of ties with h[is] natural parent[] than

from permanent disruption of h[is] relationship with h[is] foster

parents.'" N.J. Div. of Youth & Family Servs. v. I.S., 202 N.J.

145, 181 (2010) (citation omitted). "[W]here it is shown that the

bond with foster parents is strong and, in comparison, the bond

with the natural parent is not as strong, that evidence will

satisfy the requirement of N.J.S.A. 30:4C-15.1(a)(4)[.]" K.H.O.,

supra, 161 N.J. at 363.

 Dr. Brandwein conducted bonding evaluations. He found that

L.L. has a secure and stable bond with his paternal grandparents

and that they have the capacity to sustain the relationship

throughout L.L.'s adolescence and adulthood. The trial court

found L.L. was "thriving in the care of his paternal grandparents."

 12 A-3266-15T1
Conversely, Dr. Brandwein found Mother lacked that capability.

L.L. recognized Mother as his biological mother, but their bond

was not secure, and he demonstrated "negative reactions" to their

visits.

 Dr. Brandwein testified if the bond between L.L. and his

paternal grandparents was severed, the results would be

"devastating," causing "a negative grief reaction [which] would

have a long-term effect on [L.L.]'s life," which Mother could not

ameliorate. By contrast, Dr. Brandwein opined that separation

from Mother would only result in a "short-term grief reaction"

which the grandparents could mitigate.

 Crediting Dr. Brandwein's testimony, the trial court held

"termination of [Mother's] parental rights to enable [L.L.] to be

adopted by his paternal grandparents does far more good than harm."

The court's finding was supported by substantial credible

evidence.

 Mother's remaining arguments lack sufficient merit to warrant

discussion. R. 2:11-3(e)(1)(E).

 Affirmed.

 13 A-3266-15T1