**RECORD IMPOUNDED**

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court."
Although it is posted on the internet, this opinion is binding only on the
parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0934-16T1
                       A-0935-16T1

NEW JERSEY DIVISION OF CHILD
PROTECTION AND PERMANENCY,

    Plaintiff-Respondent,

v.

N.C. and R.S.,

    Defendants-Appellants.

_____

IN THE MATTER OF THE GUARDIANSHIP
OF Q.C. AND M.S., minors.

_____

        Submitted October 18, 2017 — Decided December 5, 2017

        Before Judges Fuentes, Koblitz, and Suter.

        On appeal from Superior Court of New Jersey,
        Chancery Division, Family Part, Passaic
        County, Docket No. FG-16-0068-15.

        Joseph E. Krakora, Public Defender, attorney
        for appellant N.C. (Jennifer M. Kurtz,
        Designated Counsel, on the brief).

        Joseph E. Krakora, Public Defender, attorney
        for appellant R.S. (Richard Sparaco,
        Designated Counsel, on the brief).

        Christopher S. Porrino, Attorney General,
        attorney for respondent (Andrea M. Silkowitz,

Assistant Attorney General, of counsel; Melissa Medoway, Deputy Attorney General, on the brief).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for minors Q.C. and M.S. (Margo E.K. Hirsch, Designated Counsel, on the brief).

PER CURIAM

In these consolidated appeals, N.C. (Nancy) and R.S. (Roger) appeal the October 13, 2016 Family Part order terminating their parental rights to two children. We affirm substantially for the reasons set forth in Judge Daniel J. Yablonsky's September 19, 2016 comprehensive and well-reasoned written opinion.

The evidence is set forth in detail in the judge's opinion. A summary will suffice here.

Nancy and Roger are the parents of two children, Q.C. (Quenton), born in 2008, and M.S. (Mary), born in 2010.[1] The most recent referral to the Division of Child Protection and Permanency (DCPP) occurred on June 3, 2013, when Nancy awoke in bed with her then partner to find her two-month old infant, dead, laying between them. She acknowledged going to sleep with the child on her chest

---

[1] Nancy and Roger are the parents of other children with other partners, but Quenton and Mary are the only children involved in this case.

A-0934-16T1

after smoking marijuana.  Roger was not present or involved with the incident.

Following an emergency removal, the children were placed under the care, supervision and custody of the DCPP.  The children were placed with a relative at first; but this person was not able to care for the children long-term.  They then were placed with the maternal grandmother.  Unfortunately, she allowed Nancy, whose parenting time was to be supervised, and her brother J.C., a convicted sex offender, to have unsupervised contact with the children.  The children were removed in August 2013, and placed with K.C. (Katie), a maternal great aunt.  They remained in her care until February 2014, when Katie, who was a military reservist, was deployed.  The children were placed temporarily with a resource family we refer to here as the Cannons;[2] but that placement was extended when Katie was injured while on assignment.

Quenton complained to Ms. Cannon that Katie was abusive to him.  When Katie came to visit the children, Ms. Cannon saw Katie hit Mary on the legs for discipline.  Ms. Cannon reported this to DCPP.  After an investigation, DCPP determined that Katie was not

---

[2] We use a fictitious name to maintain confidentiality.

an appropriate caretaker. The children remained with the Cannons, who have expressed an interest in adopting both children.

The court initially rejected DCPP's plan for termination of Nancy's and Roger's parental rights, and extended the time to effect reunification. When that was not successful, DCPP filed a complaint seeking termination of their parental rights to both children. Following a twelve-day trial, Judge Yablonsky entered judgment on October 13, 2016, terminating Nancy and Roger's parental rights to the children. Judge Yablonsky recited his factual findings and legal conclusions in a memorandum of opinion.

The court found that DCPP had proven by clear and convincing evidence all four prongs codified in N.J.S.A. 30:40C-15.1(a), which, in the best interests of the children, mandates termination of parental rights. In re Guardianship of K.H.O., 161 N.J. 337 (1999). He found the testimony of DCPP's caseworkers to be "credibl[e]" and "consistent with the [DCPP] record in this case."

With respect to Nancy, the court found DCPP provided services including "parenting classes, substance abuse treatment, anger management classes, psychotherapy, and a psychiatric evaluation." She obtained drug treatment and was successfully discharged but relapsed within weeks. Although she maintained sobriety at the time of trial, based on expert testimony, she remained at risk to

4

relapse because she did not "recognize her substance use as a potentially dangerous factor in her ability to care for her children." She received psychotherapy because of the death of her child. She had supervised visitation with the children, but at times she was "detached and elusive" toward them.

Addressing Roger, the court found he did not attend any of the required counseling services. He was referred to "sex-offender specific therapy" but did not attend. His visitation with the children was "irregular" and he showed "[l]imited, if any, affection . . . at [those] visits." He was discharged from the visitation program for non-attendance.

The court found that the children's safety, health or development was endangered by the parental relationship with Roger based on his "pattern of abandoning his children, non-engagement in [DCPP] recommended services, and continued absence in multiple visitation programs." The DCPP called Dr. Robert Miller, a psychologist, as an expert witness in parenting capacity and bonding. Dr. Miller opined that maintaining a relationship with Roger posed an "increasing and unnecessary risk of harm" to the children because he was unable or unwilling to remediate his parental deficit. Roger also was incarcerated at the time of trial, serving a four-year sentence for third-degree sexual

assault under N.J.S.A. 2C:14-2(c)(4).[3] As a convicted sex offender, Roger was required to comply with the registration provisions of N.J.S.A. 2C:7-2(b), commonly known as Megan's Law, and was subject to Parole Supervision for life, N.J.S.A. 2C:43-6.4.[4]

With respect to Nancy, the judge found that her continued relationship would harm the children. Quenton's teeth had decayed under her care and the required tooth extractions affected his speech. The court found she remained "at risk for relapse" for continued drug use. The court noted that Nancy's pattern of unstable relationships, involving domestic violence, exposed the children to harm. The court noted that two experts had opined that Nancy was "not capable of safely parenting the minors now or in the foreseeable future, indicating the health and safety of the children would be put at risk if they were placed back in her care." The court found she had not overcome her parenting deficits.

---

[3] An actor is guilty of sexual assault under N.J.S.A. 2C:14-2(c)(4) where the victim is less than sixteen years old but older than thirteen, and the actor is at least four years older than the victim.

[4] Roger was also adjudicated delinquent in the Family Part as a juvenile based on a sexual offense.

A-0934-16T1

The court found that DCPP made reasonable efforts to help the parents through the provision of services. DCPP also "explored . . . multiple relative placements." With respect to Katie, she was ruled out by DCPP "due to follow up allegations and reports of abuse by the minors." The court noted she had been indicted on insurance fraud and was "facing significant jail time as well as fines." Her home would not be licensable by DCPP.

The court found that termination of Nancy's and Roger's parental rights would not do more harm than good to the children based on the experts' testimony concerning the bonding evaluations. All of the experts, including Nancy's, testified that the children were securely attached to the Cannons. There was testimony that the children were thriving with them. Dr. Maureen Santina, Ph.D, an expert in psychology and bonding, testified for the Law Guardian. She and Dr. Miller testified that the children would be harmed if they returned to Nancy or Roger and that the resource parents were able to ameliorate any harm caused by termination of parental rights. Dr. Miller and Dr. Santina found the children's attachment to Nancy to be insecure or ambivalent. There was no bonding evaluation conducted involving Roger and the children. Roger does not contest the fourth prong of the best interests test on appeal.

On appeal, Nancy does not dispute that DCPP provided services to her to assist in remediating the causes of removal. She does not argue that the children should be in her care; rather, she claims that she was prejudiced when the children were removed from Katie's care and placed with the Cannons. Roger contends on appeal that he was not offered appropriate services and that the evidence was not sufficient to prove the first three prongs of the best interests test.

On appeal, our review of the judge's order terminating parental rights is limited. We defer to his expertise as a Family Part judge, Cesare v. Cesare, 154 N.J. 394, 412 (1998), and are bound by his factual findings provided they are supported by sufficient credible evidence. N.J. Div. of Youth & Family Servs. v. M.M., 189 N.J. 261, 279 (2007) (citing In re Guardianship of J.T., 269 N.J. Super. 172, 188 (App. Div. 1993)).

We conclude the factual findings of Judge Yablonsky are fully supported by the record and agree with the legal conclusions drawn therefrom. He carefully considered the proofs, which show that neither parent is capable of providing stable and adequate care for the children now or in the near future. Both parents were offered appropriate services but either did not utilize them or did not remediate the causes for removal of the children. We

agree that termination of Nancy's and Roger's parental rights to Quenton and Mary is in the children's best interests and will help the children achieve permanency with their resource parents.

We briefly comment on their specific arguments. We reject Nancy's contention that the trial court erred by not conducting a best interest hearing at some point earlier than the guardianship trial on Katie's "rule out" as a placement option. In N.J. Div. of Youth and Family Servs. v. J.S., 433 N.J. Super. 69, 75 (App. Div. 2013), certif. denied, 217 N.J. 587 (2014), we held that "the Division's rule-out authority is always subject to the Family Part's ultimate assessment of that child's best interests." Because "[t]he satisfaction of the rule-out criteria in N.J.S.A. 30:4C-12.1 is, in essence, just one element of the requirements imposed by N.J.S.A. 30:4C-15.1(a)'s four-prong 'best interests' test," id. at 85, there was no error by the court in considering the issue as part of the guardianship trial.

In addition, we find no error in the court's consideration of Katie's pending criminal charges, where she faced jail time if convicted. In making a best interests analysis, Judge Yablonsky appropriately took into consideration Katie's predicament in determining the children's prospects for permanency. N.J. Div.

<u>of Youth & Family Servs. v. L.M.</u>, 430 <u>N.J. Super.</u> 428, 450 (App. Div. 2013).

Nancy indicated that Quenton's claim of abuse was unsettled and lacked evidential support. We disagree. The record is clear that those allegations were made to multiple individuals, including doctors, therapists and DCPP caseworkers. It was entirely appropriate for the court to consider those allegations.

We also disagree with Roger's contention that the court erred because he was not offered services appropriate for his level of cognitive abilities. A DCPP representative testified that the program to which he was referred would "get to know [their clients] and know at what level to service them." In any event, Roger did not participate in the services offered.

Finally, we reject Roger's contention that the court terminated his parental rights because he was incarcerated. <u>See</u> <u>N.J. Div. of Youth & Family Servs. v. R.G.</u>, 217 <u>N.J.</u> 527, 556 (2014) (holding that "incarceration alone—without particularized evidence of how a parent's incarceration affects each prong of the best-interests-of the-child-standard—-is an insufficient basis for terminating parental rights."). A fair reading of the judge's opinion shows that the decision to terminate Roger's parental

rights was firmly based on findings well beyond the fact of Roger's incarceration.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0934-16T1