**RECORD IMPOUNDED**

NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-0735-21

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

      Plaintiff-Respondent,

v.

D.C.A.,

      Defendant-Appellant,

and

J.J.C.B.,

      Defendant.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF
I.A.C.C., J.S.C.C., A.I.C.C.
and I.C.C., minors.

_____

| APPROVED FOR PUBLICATION |
| :---: |
| **October 27, 2022** |
| **APPELLATE DIVISION** |

      Submitted October 3, 2022 – Decided October 27, 2022

      Before Judges Whipple, Smith and Marczyk.

      On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Cumberland County, Docket No. FG-06-0025-20.

Joseph E. Krakora, Public Defender, attorney for appellant (John A. Albright, Assistant Deputy Public Defender, of counsel and on the briefs).

Matthew J. Platkin, Attorney General, attorney for respondent (Melissa H. Raksa, Assistant Attorney General, of counsel; Mary L. Harpster, Deputy Attorney General, on the brief).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for minors (Meredith Alexis Pollock, Deputy Public Defender, of counsel; Neha Gogate, Assistant Deputy Public Defender, of counsel and on the brief).

The opinion of the court was delivered by

WHIPPLE, J.A.D.

Defendant D.C.A. (Divina)[1] appeals from the October 20, 2021 judgment of guardianship after trial, terminating her parental rights to four of her children. We affirm.

Plaintiff raises the following issues on appeal:

> I. THE GUARDIANSHIP JUDGMENT SHOULD BE REVERSED AS IT RESTS ON A MOUNTAIN OF INADMISSIBLE EVIDENCE INCLUDING THE PURPORTED ADMISSIONS OF THE MOTHER CONTAINED WITHIN THE REPORTS OF NON-TESTIFYING EXPERTS, AND THEIR OPINIONS AND DIAGNOSES ERRONEOUSLY ADOPTED BY THE COURT UNDER THE UMBRELLA OF DR. [ALAN] LEE'S OPINION.

---

[1] We use pseudonyms to protect the identity of the family pursuant to Rule 1:38-3(d)(12) and for ease of reference. In doing so, we mean no disrespect.

a. The reports of non-testifying experts were only offered by [the New Jersey Division of Child Protection and Permanency (the Division)] to "show[ ] that the Division offered the service, that the service was complied with"; instead, the [trial] court accepted the truth of the hearsay contained within.

b. The [trial] court's extraction of the mother's "admissions" from the non-testifying experts' reports to establish "domestic violence" between the parties was error and resulted in an egregious due process violation.

c. Even if statements made by the mother to the non-testifying experts were "statements against interest" or "statements of a party-opponent," the non-testifying experts' written versions of the "admissions" were hearsay not subject to any exception.

d. Although claiming it did not do so, the [trial] court erroneously adopted the opinions and diagnoses of all of the non-testifying experts because Dr. Lee did.

II. THE GUARDIANSHIP JUDGMENT SHOULD BE REVERSED BECAUSE THE [TRIAL] COURT IMPROPERLY RELIED ON EVIDENCE THAT SEPARATING THE CHILDREN FROM THE FOSTER PARENTS WOULD CAUSE SERIOUS AND ENDURING EMOTIONAL OR PSYCHOLOGICAL HARM TO THEM TO TERMINATE THE MOTHER'S PARENTAL RIGHTS IN VIOLATION [OF] THE JULY 2, 2021 STATUTORY AMENDMENTS AND THE EXPLICIT FINDINGS OF THE LEGISLATURE.

3

III. THE GUARDIANSHIP JUDGMENT AGAINST THE MOTHER IN THIS CASE SHOULD BE REVERSED BECAUSE DIVINA NEVER HARMED ANY OF THE CHILDREN OR PLACED THEM AT RISK, VIA "DOMESTIC VIOLENCE" OR OTHERWISE.

IV. THE GUARDIANSHIP JUDGMENT AGAINST THE MOTHER SHOULD BE REVERSED BECAUSE NEITHER THE "TOXIC RELATIONSHIP" RELIED ON BY THE COURT TO SUPPORT PRONG ONE, NOR DR. LEE'S NET OPINION THAT DIVINA LACKED FITNESS TO PARENT, SATISFY PRONG TWO OF THE BEST INTERESTS TEST.

a. Lee delivered nothing more than a "net opinion" that Divina lacked parental fitness, and his methodology in conducting a psychological evaluation lacked any semblance of reliability when he failed to use any actual testing.

b. The [trial] court's reliance on Dr. Lee's opinions to find that Divina suffers from schizophrenia to find that she was unfit, must be reversed, as Dr. Lee's opinion was "provisional" meaning that the diagnosis was utterly speculative.

V. THE [TRIAL] COURT'S PRONG THREE CONCLUSION SHOULD BE REVERSED BECAUSE [THE DIVISION]'S EFFORTS IN BLOCKING VISITATION RECOMMENDED BY ITS OWN PROVIDER WERE PATENTLY UNREASONABLE AND THWARTED REUNIFICATION.

4

VI. THE JUDGMENT OF GUARDIANSHIP SHOULD BE REVERSED AS THE FAMILY PART JUDGE ERRONEOUSLY RELIED ON SUPPOSED HARM FROM SEPARATION FROM THE TEMPORARY CAREGIVERS AS A BASIS FOR CONCLUDING THAT TERMINATION OF PARENTAL RIGHTS WOULD NOT DO MORE HARM THAN GOOD.

We have reviewed the record and it informs our decision. Divina's children are I.A.C.C., age seven (Ignacio); J.S.C.C., age five (Josefina); A.I.C.C., age three (Antonia), and I.C.C., age two (Ian). Their father is J.J.C.B. (Javier). Divina and Javier have an additional child, S.C.C., age one, (Sam), who is presently in the custody of the New Jersey Division of Child Protection and Permanency (Division). Sam is not involved in this appeal.

Prior to the Division's involvement, Javier and Divina were investigated by New York Child Protective Services after a report that Javier assaulted Divina during an argument in which the couple smashed objects, including a crib, in the presence of then three-month-old Ignacio. Javier was arrested, and an order of protection was issued. Nevertheless, their relationship continued. The New York police received eight calls concerning domestic violence between the parents between 2015 to 2018.

In spring of 2018, Javier left New York and moved to Vineland, New Jersey. He was homeless. Within a few weeks, Divina disclosed the address

of the Massachusetts shelter where she and the children were residing. Javier went to visit her. Javier brought her and the children back to Vineland.

On July 5, 2018, while staying at a motel, Divina called the Vineland police and reported that Javier was harassing her. This began the Division's involvement. The local police contacted the Division, who dispatched a caseworker to meet with Divina at the Vineland Police Department in the early morning, around 3 a.m.

Divina's account of the events leading up to this first encounter was rambling and inconsistent. Throughout the record, Divina demonstrated herself as a poor historian of events, telling irreconcilable and incongruous accounts depending upon when and to whom she was speaking. Her accounts often conflicted with her observed behavior. On this day, she claimed she was five weeks pregnant. She expressed concern that she would lose the baby, due to low blood sugar, but refused medical care. Divina claimed her arrival in Vineland was a coincidence: she had intended to drive to Newark, but instead she got lost and ended up around a hundred miles away in Vineland, where she coincidentally met Javier's adult son at a gas station.

She was staying at a Rodeway Inn but was out of money. She reported that Javier's adult son smoked marijuana in the hotel room, which concerned her because Ignacio suffered from severe asthma. When she left the room with

6

him to get some air, Javier assaulted her; the case worker observed "significant bruising to her inner arms." The Vineland Police arrested Javier.

The Division contacted a domestic violence hotline and found a placement for Divina and her children at a local shelter. Divina became angry and refused to go, but eventually stated the Division "could just take them," referring to the children. She became confrontational with the caseworker and refused to provide medical information about the children. At this point, the Division conducted an emergency removal of the children.

Four days later, on July 9, 2018, the court granted the Division care, custody, and supervision of Ignacio and Josefina. Two days afterwards, Divina cancelled a scheduled visit at the last moment, causing the children visible distress. The following day, Divina met with the Division. She was living in her car.

Divina and Javier were allowed supervised visits with the children each week but were kept separate from each other. On July 18, Divina and Javier arrived together at the Division office, without an appointment. Divina said, "God spoke to her and told her that she was getting her children today, and she was not leaving until she gets her children." The Division arranged for separate same-day visits for both parents. The visits went well, and Ignacio

and Josefina were happy to see their parents. However, that same afternoon, police responded to a separate simple assault incident involving the couple.

Later that August, Divina cut short a visit with the children and instructed the Division to return them to their placement home, which caused Ignacio and Josefina to cry. Divina was then psychologically evaluated at the Division's request. During the evaluation, she disputed the Division's referral information, including whether she was homeless, whether she and Javier had a continuing relationship, whether they lived together, and whether Javier had ever assaulted her. She reported she suffered from post-partum depression when Ignacio was born and that she had attended four months of psychotherapy at that time in order to treat it. The evaluating doctor recommended Divina undergo psychotherapy with a clinician who specializes in psychopathy, further psychiatric evaluation, and parenting skills training. He also recommended the Division maintain the current supervised visitation plan.

Police responded to two more incidents involving the couple that same August. At the end of the month, the parents were separately interviewed by the Division. Divina reported she had become involved with Javier four years earlier. Javier started using drugs and alcohol, and he beat her while she was pregnant with Ignacio. She reported in December 2015, shortly after Ignacio

8

was born, Javier ambushed and raped her. In response, she obtained a restraining order, which she later dropped when Javier began attending court-ordered services. She then explained that about a month prior to Division involvement, in May 2018, Javier came into her house, hit her, "went crazy" and destroyed her stuff, smashed the taillights on her car, and flattened her tires. Therefore, she said, she left to go to the Massachusetts shelter, precipitating her arrival in Vineland.

On October 2, 2018, the Division referred both parents for psychiatric evaluations, and Divina began weekly individual therapy at the Division office. She was employed, lived at a rooming house in Vineland, and was saving so she could rent an apartment. Through Community Treatment Solutions (CTS), Divina continued supervised visitation with the children; the visits generally went well. However, she also missed some parenting classes during this time and was non-compliant in attending therapy.

In November 2018, Divina's assigned therapist referred her for a psychiatric examination. On January 15, 2019, Divina kicked and punched the Division permanency supervisor at the Division office at the end of a visit with Ignacio and Josefina. After this, she was not permitted to have contact with Division staff without police present. Divina missed several visits from January 2019 through April 2019.

A-0735-21

In April 2019, Antonia was born. The Division removed Antonia from the hospital and placed her in a separate home from Ignacio and Josefina. Divina began to visit all three children, together. She would frequently bring them toys and food. Divina re-entered therapy around this time and was consistent for sixty-two weeks.

However, in July 2019, the Vineland police responded to four incidents with allegations of simple assault, defiant trespass, and harassment involving the parents. That same summer, Divina began living in a studio apartment with Javier. The police responded again to a domestic dispute between the two in November 2019. On November 6, 2019, the Division filed a complaint seeking guardianship of the four children.[2]

In February 2020, Ignacio and Josefina were transferred to a new foster family. That same month, Ian was born, and was initially placed with Ignacio and Josefina but was later removed by court order to a different resource home. Divina called the police about another domestic dispute towards the end of the month.

In March 2020, Governor Murphy declared a State of Emergency related to the pandemic and issued a Stay-at-Home order about two weeks later. The

---

[2] Ian was not part of the original complaint but was added on November 27, 2020.

A-0735-21

family switched to video visitations, due to the circumstances. Divina continued to attend therapy sessions and domestic violence counseling.

In May 2020, Divina completed her assigned parenting skills and domestic violence courses. That same month, however, she denied having a history of domestic violence issues with Javier. The two shared a home together and were in a "committed relationship" at that time. However, the police continued to respond to more domestic incidents involving the parents. Divina told the Division that she wanted Javier to get help, due to an incident that happened a week earlier. She denied assaulting the Division supervisor in January 2020, and instead claimed she merely grabbed the supervisor's hand because she was in labor.[3]

In August of 2020, Divina returned to in-person visits with the children. She was also charged with aggravated assault when she spit on a police officer who was responding to a domestic dispute call concerning the couple. That same month, Divina completed another psychological evaluation, telling the psychologist that she and Javier had been separated for two years, and that Javier's adult children had threatened to kill her and the children. The therapist recommended Javier and Divina receive couples' counseling and

---

[3] Antonia was born in April of that year, not January.

11

more parenting training, in addition to continuing individual therapy and supervised therapeutic visitation.

On September 1, 2020, Dr. Alan Lee, Psy.D., evaluated Divina. Dr. Lee noted that:

> [Divina] is psychologically less mature and less developed than most adults, with propensity to poor coping, poor stress management, and poor frustration tolerance. She is characteristically rather impulsive, reactive, and simplistic in her functioning. There are concerns of her inconsistent reporting and statements that raise concerns of an underlying thought disorder, some psychotic thinking and impaired perceptions of reality. She is prone to impulsive, aggressive, and reactive behaviors and attitudes. She is characteristically rather angry, hostile, and demeaning. There have been concerns of her aggression towards others. She has a pending charge. Her knowledge of parenting and childrearing are rather limited and poor, especially for someone who has given birth to four children and [is] expecting their fifth child. Her prognosis for significant and lasting changes is poor. She is not supported as an independent caretaker of the minor children at this time and within the foreseeable future. As such, the most central and principal recommendation is for other permanency planning for the minor children besides reunification to birthmother.

A week after this, on September 8, defendant completed yet another psychiatric evaluation. The psychologist recommended a mood stabilizing agent to augment her current time in therapy. At a meeting with the Division a week after, Divina disclosed that she was once again living with Javier.

12

Divina began to miss visits with the children throughout October and November of 2020, despite the Division offering accommodations. Divina returned to visits in the middle of December.

In April of 2021, the couple had another encounter with police, and Javier spent a night in jail. Javier was convicted of harassment, and as a result the State of New York issued another order of protection between the parents on April 6, 2021. A few days later, New York police again responded to a domestic dispute involving the parents.

On April 14, 2021, Divina contacted the Division in distress because she was about to be evicted, and Javier had taken the rent money for himself. When the Division reached out to Javier, he expressed concern for Divina's mental health, and stated that he did not want to live with her anymore, while conceding he was currently spending the night at her place. Divina was scheduled for another psychiatric evaluation the following week, but she cancelled the appointment.

In May 2021, she and Javier began joint supervised visits with the children, at the recommendation of their service provider, CTS. The visits went well. However, Divina then missed five of her last nine therapy sessions. A letter from her therapist to the Division attributed her poor attendance (after sixty-two weeks of consistent performance) to recent financial and housing

issues. The letter also noted that "Divina has always been concerned with her children and the desire to get them back."

In June 2021, CTS recommended that the couple be given the opportunity to visit the children together, unsupervised. The Division declined, citing the parents' lack of therapeutic progress in other areas.

On August 18, 2021, police were dispatched to the parent's home to respond to another domestic disturbance. About a month later, on September 15, Javier called the police to report that Divina had smashed his car windows with a brick. This incident ended the couple's joint visitation with their children. During the trial Divina was served with a temporary restraining order which prohibited contact with Javier due to the brick incident.

The five-day trial commenced on June 23, 2021, and concluded in September. The Division presented testimony from Division workers Zaleen Concepcion and Brenda Rosado, Millville Police Officer Carlos Vazquez, and Alan J. Lee, Psy.D. The children's Law Guardian presented no testimony but supported termination. Neither parent testified, but Divina presented testimony from her expert, David Bogacki, Ph.D.

As of the time of the trial, Divina was receiving individual counseling, couples' counseling, parenting skills training, and therapeutic visitation on an ongoing basis. The Division had referred her to a psychiatric evaluation to

14

determine if she needed medication. Ignacio and Josefina were in a non-adoption home and were looking for a pre-adoptive family. Antonia and Ian were in separate homes, but each foster family was willing to adopt.

The Division's expert, Dr. Lee, opined in favor of terminating both parents' rights based on his earlier psychological examination as well as the bonding evaluation of the children. Dr. Lee used a multi-method approach with multiple procedures, including an interview component, various psychological tests, and a review of other material provided to him from the Division.

As a result of his analysis, Dr. Lee "provisionally" diagnosed Divina as having an "unspecified schizophrenia spectrum and other psychotic disorder." He noted that "[she] appeared to often deny events that were otherwise reported by people," she had "a propensity towards inconsistent types of behavior," and she lacked impulse control. He also described her "heightened level of anger" and "propensity for aggressive types of behaviors and attitudes." The children, he concluded, were therefore at a heightened risk of exposure to unsafe, violent situations. Dr. Lee's prognosis for change was poor; Divina's problems were "chronic," "difficult to remediate," and adversely impacted her ability to care for her children.

15

Dr. Lee also conducted bonding evaluations, which resulted in his determination that each child shared an ambivalent and insecure relationship with Divina. He opined there was a low risk of severe and enduring harm if the relationship were to be severed. Accordingly, Dr. Lee recommended against reunification.

Divina's expert, Dr. Bogacki, never met with Divina or the children and so was limited to offering a critique of Dr. Lee's methodology and conclusion. Dr. Bogacki disputed Dr. Lee's interpretation of Divina's defensive response to certain psychological tests, which in his view compromised the results. Dr. Lee rebutted this characterization, noting that Divina's defensiveness "was and is an important finding."

The trial court issued its oral decision on October 20, 2021, terminating both Divina and Javier's parental rights. The court issued findings pertaining to the four-prong best interests of the child test delineated in N.J.S.A. 30:4C-15.1(a). It found that the Division proved each prong in turn by clear and convincing evidence and terminated both parents' parental rights. Defendant appealed. Javier did not.

I.

We review a family court's decision to terminate parental rights to determine whether "the decision . . . is supported by substantial and credible

16

evidence on the record." N.J. Div. of Youth & Fam. Servs. v. F.M., 211 N.J. 420, 448 (2012) (internal quotation marks and citations omitted). We defer to the factual findings of the family court, due to that court's special expertise in family matters, and the inadequacies of a cold record. Ibid. "We will not overturn a family court's fact findings unless they are so wide of the mark that our intervention is necessary to correct an injustice." Ibid.

We review issues of statutory interpretation de novo. McGovern v. Rutgers, 211 N.J. 94, 108 (2012). A trial court's statutory interpretation is nonbinding. Ibid. Before this court is an interpretation of the 2021 amendment to prong two of best interests test contained in N.J.S.A. 30:4C-15.1(a). We review this interpretation de novo and need not defer to the trial court's judgment. McGovern, 211 N.J. at 108.

"A parent's right to enjoy a relationship with his or her child is constitutionally protected." In re Guardianship of K.L.H., 161 N.J. 337, 346 (1999). The State may terminate parental rights to protect the welfare of the children, but this is a limited power, applying only in circumstances where the parent is unfit, or the child has been harmed. In re Guardianship of J.C., 129 N.J. 1, 10 (1992). Children also have the right to a permanent, safe, and stable placement. N.J. Div. of Youth & Fam. Servs. v. C.S., 367 N.J. Super. 76, 111 (App. Div. 2004).

To balance these competing interests, courts apply the "best interests of the child" test, which is codified in N.J.S.A. 30:4C-15.1(a). That statute delineates a four-part inquiry which, taken as a whole, determines whether termination of parental rights is in a child's "best interests":

> 1. The child's safety, health, or development has been or will continue to be endangered by the parental relationship;
>
> 2. The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm;
>
> 3. The division has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to the termination of parental rights; and
>
> 4. Termination of parental rights will not do more harm than good.
>
> [N.J.S.A. 30:4C-15.1(a).]

To prevail, the Division must establish the above standards by "clear and convincing" evidence. N.J. Div. of Youth & Fam. Servs. v. A.W., 103 N.J. 591, 604 (1986). This denotes a burden which lies between a preponderance standard and a "beyond a reasonable doubt" standard; it should produce "a firm belief or conviction as to the truth of the allegations sought to be established." In re Purrazzella, 134 N.J. 228, 240 (1993).

18

II.

First, we address Divina's argument that the trial court improperly considered evidence of the children's relationship with their foster parents in violation of prong two of the best interest test. That prong was recently amended by the Legislature, which removed the sentence: "[s]uch harm may include evidence that separating the child from his resource family parents would cause serious and enduring emotional or psychological harm to the child." N.J.S.A. 30:4C-15.1(a)(2) (amended 2021). The Legislature did not alter the other components of the best interest standard.

Divina argues that this deletion is dispositive on its face, and the removal of such language means all evidence concerning a child's relationship with resource caregivers is barred, even in the context of other prongs of the best-interest standard. We recognize that prong two as amended emphasizes consideration of whether a parent is able to overcome harm to the child as well as whether the parent can cease causing future harm. The amendment clearly isolates those specific inquiries from consideration of the bonds a child has forged with resource caregivers. Nevertheless, we do not understand the amendments to prong two to mean that such a bond may never be considered within any part of the best interests analysis.

19

Neither the legislative history nor the plain text necessitates such a sweeping conclusion. First, there is the text itself. Taken as a whole, the statute still requires a finding that "[t]ermination of parental rights will not do more harm than good." N.J.S.A. 30:4C-15.1(a)(4). "The question ultimately is not whether a biological mother or father is a worthy parent, but whether a child's interest will best be served by completely terminating the child's relationship with that parent." N.J. Div. of Youth & Fam. Servs. v. E.P., 196 N.J. 88, 107 (2007).

The court must make an evidentiary inquiry into the status of children in placement, to determine whether the child is likely to suffer worse harm in foster or adoptive care than from termination of the biological parental bond. N.J. Div. of Youth & Fam. Servs. v. M.M., 189 N.J. 261, 281 (2007) ("[T]o satisfy the fourth prong, the State should offer testimony of a well-qualified expert who has had full opportunity to make a comprehensive, objective, and informed evaluation of the child's relationship with both the natural parents and the foster parents.") (internal quotation marks and citations omitted).

Prong four allows a court to find that remaining with an otherwise "unfit" parent is still within a child's "best interests" if there are significant concerns about the Division's ability to place a child with an appropriate caregiver. The court has used prong four to effectuate this exact result in the

20

past. N.J. Div. of Youth & Fam. Servs. v. L.M., 430 N.J. Super. 428, 454 (App. Div. 2013). "Although [father] is not without his parental flaws, he has maintained a consistent interest in providing for [daughter] since his release from prison. . . . Given [daughter's] bleak prospects for adoption, the termination of her parental rights does not appear to have any real compensating benefit." Ibid. The L.M. court ruled against the Division, finding that it had failed to prove that termination would not do more harm than good. Ibid.

Additionally, removing the court's access to information concerning the child's ability to forge bonds with resource caregivers would disharmonize the statute. Resource placements may include relative caregivers. Legislative materials indicate that a preference for the preservation of parental rights and kinship care was the specific concern in enacting the amendment. Specifically, the Legislature found that:

> a. Foster care is intended by existing state and federal statute to be temporary.
>
> b. Kinship care is the preferred resource for children who must be removed from their birth parents. There are many benefits to placing children with relatives or other kinship caregivers, such as increased stability and safety as well as the ability to maintain family connections and cultural traditions.
>
> . . . .

21

d. Parental rights must be protected and preserved whenever possible.

e. Children are capable of forming healthy attachments with multiple caring adults throughout the course of their childhood, including with birth parents, temporary resource parents, extended family members, and other caring adults. . . .

f. The existence of a healthy attachment between a child and the child's resource family parent does not in and of itself preclude the child from maintaining, forming or repairing relationships with the child's parent. . . .

g. It is therefore necessary for the Legislature to amend current laws to strengthen support for kinship caregivers, and ensure focus on parents' fitness and the benefits of preserving the birth parent-child relationship, as opposed to considering the impact of severing the child's relationship with the resource family parents.

[2021 N.J. Sess. L. Serv. Ch. 154 (Senate 3814) (West).]

The Legislature then went on to make several alterations to the code, most of which strengthened the position of kinship caregivers. The law was clearly intended to reflect a preference for viable kinship guardians and fit parents over unrelated foster caretakers. E.g., 2021 N.J. Sess. L. Serv. Ch. 154 (Senate 3814) (West) (amending definition of kinship "caregiver" in N.J.S.A. 3B:12A-2 to allow a shorter cohabitation period). Because barring all evidence of foster placement, as defendant advocates, could actually harm a

parent or kinship guardian's petition to retain rights, the Legislature's goal would go unfulfilled.

Illustratively, on May 17, 2021, (the day the bill was released) the Assembly Health Committee specifically considered the alteration to prong two. Assembly Health Committee Meeting, (Monday, March 8, 2021) (https://njleg.state.nj.us/archived-media/2020/AHE-meeting-list). Assemblywoman DeAnne DeFuccio expressed concerns regarding the deleted language. Id. at 43:35. Legislative aide Francesco Ferrantelli responded:

> [T]he intention of removing that language is because leading practice tends to focus on the harm from separation from foster families, sometimes at the exclusion of other factors. And we just want to make it clear in the statute that the judge should be considering the totality of the circumstances in every case in evaluating facts and making a particularized decision based on the best interests of each child. . . . We just want to make it clear in terms of the guidance that we give judges going forward, and litigants, that they are considering all harm and not focusing on one particular type, so they make decisions tailored to each individual child.
>
> [Id. at 44:35 (emphasis added).]

This emphasis on a "totality of the circumstances" approach is supported by the Court's longstanding interpretation of N.J.S.A. 30:4C-15.1.[4] And to

---

[4] The New Jersey Supreme Court has clarified, even prior to the amendment, that "[t]he protection of parental rights continues when a child is placed in foster care." N.J. Div. of Youth & Fam. Servs. v. I.S.S., 202 N.J. 145, 170

fully consider the "totality of the circumstances" courts must, at the very least, consider the child's bond to a current placement when evaluating prong four, as discussed above. The legislative history and plain text, therefore, do not support the broad prohibition on this type of evidence, as defendant proposes.

We construe the deletion from prong two more narrowly than defendant urges, in a way that gives greater effect to the alteration, in a manner that remains coherent with prong four. The amended statute, in our view, requires a court to make a finding under prong two that does not include considerations of caregiver bonding, and then weigh that finding against all the evidence that may be considered under prong four—including the harm that would result from disrupting whatever bonds the child has formed. This is what the court did in L.M., 430 N.J. Super. at 458.

Thus, we discern no misapplication of the best interest analysis under either prongs two or four based upon the record.

### III.

Addressing defendant's various evidence arguments, which we have thoroughly considered, we conclude they are without merit. There is no

---

(2010) (internal quotation marks and citations omitted). "It is well established that the period of time a child has spent in foster care is not determinative of whether parental rights to that child should be terminated. . . ." Ibid. This reflects a totality approach to the evidence that the Legislature was attempting to emphasize, rather than hamper.

evidence that the Division fell below the standard established by N.J.S.A. 30:4C-15.1(c), whereas uncontroverted testimony supports the court's conclusion. We review findings of fact on a deferential basis, and there is a multitude of support for the trial court's determination to sever parental rights to the four children.

Confronted with this record, we note the trial court concluded that: 1) under the first prong, defendant's violent relationship with Javier constituted harm; 2) under the second prong, the continued tumult in that relationship, coupled with Divina's mental instability, established that she was unable to remedy the harm; 3) the Division had provided reasonable services and no alternative familial guardian was feasible; and 4) at that time, the resource placements would not result in greater harm than good.

The judge's opinion gave thoughtful attention to the importance of permanency and stability from the perspective of the child's needs and found the Division had established by clear and convincing evidence the statutory grounds for termination of defendant's parental rights. Furthermore, the judge found the Division had proven all four prongs of the best-interests test, N.J.S.A. 30:4C-15.1(a), which permits termination of parental rights. In re Guardianship of K.H.O., 161 N.J. 337, 347-48 (1999). We have reviewed the record and do not conclude that reliance upon embedded hearsay and other

excludable evidence prominently undergirded the four prongs, and if some evidence was improperly considered, it constituted harmless error. The trial judge, when making specific findings, was exclusively concerned with defendant's parental fitness, largely as a result of her own behavior, the ample evidence of continued domestic violence between the parents, and the lack of consistent progress despite reasonable efforts by the Division. The remaining arguments are without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(2).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

26

A-0735-21