# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NOS. A-2680-23
     A-2681-23

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

 Plaintiff-Respondent,

v.

M.M. and A.C., III,

 Defendants-Appellants,

and

L.C.,

 Defendant.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF F.A.C.,
A.M.C., L.M., and L.M., minors.

_____

Submitted September 23, 2025 – Decided October 21, 2025

Before Judges Gilson, Perez Friscia, and Vinci.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Camden County, Docket No. FG-04-0018-24.

Jennifer N. Sellitti, Public Defender, attorney for appellant M.M. (Catherine Wilkes, Assistant Deputy Public Defender, of counsel and on the briefs).

Jennifer N. Sellitti, Public Defender, attorney for appellant A.C., III (Daniel A. DiLella, Designated Counsel, on the briefs).

Matthew J. Platkin, Attorney General, attorney for respondent (Sookie Bae-Park, Assistant Attorney General, of counsel; Alicia Y. Bergman, Deputy Attorney General, on the brief).

Jennifer N. Sellitti, Public Defender, Law Guardian, attorney for minor F.A.C. (Meredith Alexis Pollock, Deputy Public Defender, of counsel; Noel C. Devlin, Assistant Deputy Public Defender, of counsel and on the brief).

Jennifer N. Sellitti, Public Defender, Law Guardian, attorney for minors A.M.C., L.M., and L.M. (Meredith Alexis Pollock, Deputy Public Defender, of counsel; Todd Wilson, Designated Counsel, on the brief).

PER CURIAM

M.M. (Myra) and A.C., III (Arthur) appeal from an April 17, 2024 judgment terminating their parental rights to four children.[1] The judgment gave

---

[1] We use initials and fictitious names to protect the privacy interests and confidentiality of the record. See R. 1:38-3(d)(12).

guardianship of the children to the Division of Child Protection and Permanency (the Division) with the plan that the children be adopted. Myra focuses her arguments on two of the children, contending that the Division failed to prove three of the prongs of the child's best-interests test necessary for the termination of her parental rights. See N.J.S.A. 30:4C-15.1(a). Arthur challenges the judgment as to one of the children, asserting that the Division failed to prove each of the four prongs of the child's best-interests test. Having reviewed the record in light of the parties' contentions, we affirm because the trial court's findings of facts are supported by substantial credible evidence and it correctly applied the well-established law.

I.

We summarize the facts from the record, including the evidence presented at a two-day guardianship trial.

Myra is the mother of six children: N.V.M. (Noah), born in November 2005; I.A.C. (Iris), born in November 2008; F.A.C. (Fay), born in January 2011; A.M.C. (Adam), born in June 2013; L.L.M. (Logan), born in April 2020; and L.I.M. (Luna), born in June 2021. Noah and Iris are both over the age of eighteen and were not part of the judgment.

A-2680-23

Arthur is the father of Iris, Fay, and Adam. Arthur also had a child with another woman, but that child tragically died in December 2023.

Fay was originally part of the judgment but in March 2025, Fay's permanency plan changed when her resource parent decided not to proceed with the adoption. The Division then moved to remand this matter concerning Fay, which we granted. On remand, the trial court vacated the judgment as to Fay.

Accordingly, this appeal now involves challenges to the termination of parental rights concerning Adam, Logan, and Luna. Myra focuses her arguments on Logan and Luna. The biological father of Logan and Luna surrendered his parental rights, and he is not appealing the judgment. Arthur is appealing the judgment as it concerns Adam, but not as to Logan and Luna, who are not his biological children.

The Division has a long history of involvement with Myra, Arthur, and their children. Since 2009, the Division has received referrals and investigated allegations of neglect, domestic violence, and physical abuse of the children.

Myra has mental health and substance abuse issues. A psychologist diagnosed her as exhibiting "borderline intelligent functioning" and suffering from "persistent depression disorder." Arthur has struggled with substance abuse disorders and has been incarcerated for various criminal convictions.

4

Both Myra and Arthur have been substantiated for physical abuse of the children in the form of corporal punishment.

In May 2017, following a referral concerning physical abuse of Myra's oldest child, the Division obtained custody of Noah, Iris, Fay, and Adam. In 2018, Arthur refused services from the Division and shortly after was sentenced to probation for distribution of illegal substances. The Division provided services to Myra, and she regained custody of the children in May and June of 2019. The Division, however, maintained care and supervision of the children. In 2020, Arthur was convicted of several new drug offenses and was found to have violated his probation, resulting again in his incarceration.

In December 2021, the Division again removed the children from Myra's care after she was arrested for physically assaulting Noah. That same month, the family court granted the Division custody of Iris, Fay, Adam, Logan, and Luna. The Division was also granted care and supervision of Noah, and he returned to living with his paternal grandmother.

Since December 2021, Logan and Luna have been in the care of Y.G. (Yara). Adam has various behavioral challenges, and he has been diagnosed with oppositional defiant disorder and attention-deficit hyperactivity disorder. He has received care in several treatment homes and, since January 2023, he has

5

been living with M.F. (Mable), a non-family caregiver. While Noah has been with Mable, there have been significant improvements in his behavioral conditions.

Following the children's removal in December 2021, the Division spent several years providing various services to Myra and Arthur. During that time, both Myra and Arthur underwent several evaluations, including psychological evaluations. Myra was given psychiatric and psychotherapy consultation, which included cognitive and behavioral therapy, parenting skills, and anger management. She was allowed to visit the children, but during those visits she exhibited poor parenting skills, resulting in unsafe conditions. Due to Myra's inability to maintain control of the children, her visits eventually had to be conducted virtually. After Arthur was released from prison in December 2021, he entered an intensive outpatient drug treatment program, and the Division provided him with additional services, including parenting classes and housing assistance.

By mid-2023, however, the Division believed that neither Myra nor Arthur had developed the skills to allow them to parent any of their children. Consequently, the Division filed for guardianship in October 2023.

6

A guardianship trial was conducted on April 2 and 3, 2024. The Division presented testimony from Jacquline Cassidy, a Division adoption case worker, Dr. Melanie A. Freedman, Ph.D., an expert witness, and three resource caregivers: Mable, Yara, and Susan (who had cared for Iris). The Division also submitted numerous exhibits into evidence. Myra was present at trial and testified on her own behalf. Arthur did not appear at trial, nor did he call any witnesses or submit any evidence.

Dr. Freedman was qualified as an expert in clinical and forensic psychology. Her testimony included summarizing the psychological and bonding evaluation she had conducted. Dr. Freedman explained that Myra had made little progress in developing the skills to parent the children during the more than two-year period she was provided with services. She also testified to her conversation with Myra regarding reunification, and Myra agreed she needed in-home help to take care of the children. Dr. Freedman noted that Myra had no real plan of reunification because she had not taken steps to obtain outside help.

Dr. Freedman diagnosed Myra with borderline intellectual functioning and explained that it affected her ability to learn from experience and implement solutions that would enable her to care for her children. She explained that Myra

A-2680-23

was unable to appreciate when she placed the children in harmful situations. Dr. Freedman also diagnosed Myra with persistent depressive disorder and explained that disorder affected her ability to address the children's needs because she would often simply shut down emotionally. Based on those diagnoses, the doctor expressed concerns regarding Myra's ability to parent her children, most of whom had emotional or behavioral issues.

Concerning Arthur, Dr. Freedman summarized various evaluations which Arthur had undergone. She explained that during one of her evaluations, Arthur had acknowledged his substance abuse problems and that following completion of an Intensive Supervision Program he "spiraled out of control." Dr. Freedman diagnosed Arthur with multiple substance abuse disorders and a bereavement condition. Dr. Freedman also explained that Arthur, like Myra, did not have a reunification plan. She opined that it would be harmful for Adam to reunite with Arthur because Arthur had made little progress in finding stable housing and employment and addressing his anger control problems.

Summarizing her overall conclusions, Dr. Freedman opined that neither Myra nor Arthur could safely parent their children despite the various services they had received. She also testified that they had little prospect of gaining the skills needed to be adequate parents at any time in the foreseeable future.

A-2680-23

Dr. Freedman then described the bonding evaluation she conducted between Arthur and Adam. She noted that in "no way was he patient, loving, or caring to his son," and he used threatening language, which was "troubling." From this encounter, Dr. Freedman concluded "the risk of engaging in [the] types of behaviors that led to these removals is still very much present," and his actions show "[he] is not as committed or interested in a parenting role."

Concerning Logan and Luna, Dr. Freedman found that they had positive but weak bonds with Myra. Dr. Freedman explained that neither Logan nor Luna saw Myra as their primary caregiver. Dr. Freedman also explained that Adam had a neutral and "weakened" bond with Myra.

In comparison, Dr. Freedman stated that the bonding evaluation between Logan, Luna, and Yara showed that the children had a positive and strong attachment to Yara. Dr. Freedman noted that Logan exhibited certain behavioral issues and Yara was effectively dealing with those issues by giving the children consistent support. Dr. Freedman opined that Logan's and Luna's best chance of finding permanency was to remain in the care of Yara. Regarding Adam, Dr. Freedman found that he seemed "relaxed and engaged" with Mable, which was in stark contrast with how he seemed with Arthur, whom Adam feared.

A-2680-23

Overall, Dr. Freedman testified that she supported terminating Myra's and Arthur's parental rights to all the children. She explained that the children's best chance for positive and permanent homes was adoption by their respective resource caregivers.

Cassidy testified about the Division's involvement with the family. She detailed the history of the referrals and investigations the Division had conducted. She also summarized her observation of the children in their respective placements.

In their testimony, Yara and Mable explained the care they had given to Adam, Logan, and Luna. Both Yara and Mable explained how they had worked to address the children's behavioral issues and had worked to provide emotional stability. Mable and Yara also testified that the Division worker discussed the differences between adoption and Kinship Legal Guardianship (KLG), they understood the differences, and they preferred adoption over KLG.

On April 17, 2022, the trial court entered a judgment terminating Myra's and Arthur's parental rights to the children and granting guardianship to the Division. That same day, Judge Francine I. Axelrad, who was the trial judge, rendered a thorough oral decision, making detailed findings of facts and conclusions of law.

 A-2680-23

Judge Axelrad found that the Division had proven by clear and convincing evidence the four prongs of the child's best-interests test. In making that finding, the judge credited the testimony of both Dr. Freedman and Cassidy.

Addressing the first and second prongs, Judge Axelrad found that both Myra and Arthur had neglected their children by withholding parental attention and care and failing to remedy those deficiencies in the more than two years that the children were removed from their custody. The judge found that Myra's mental health contributed to her "significant" and "serious" parenting deficiencies and her inability to learn from services.

Concerning Arthur, the judge found that his incarceration and housing issues impacted both prongs one and two and those problems were compounded by his substance abuse issues. The judge also relied on Arthur's adverse interactions with his son during his supervised visits. The judge concluded that neither parent was able nor willing to provide a safe and stable home for any of the children now or in the future.

Turning to prong three, the judge found that the Division had made substantial and reasonable efforts to provide "every service possible" to each parent. Thus, the judge found that the Division satisfied the first part of prong three.

11

Evaluating the second part of prong three, the court credited the expert testimony of Dr. Freedman that it was in the children's best interests to have safe and secure permanent homes with the resource caregivers who had taken care of those children for years. In making that finding, the court noted that stability was critical for the children.

Regarding the resource caregivers, Judge Axelrad found that they each understood the difference between adoption and KLG and expressed an informed decision to adopt. Acknowledging that KLG and adoption were to be treated equally in terms of permanency plans, Judge Axelrad found that adoption was in the children's best interests based on all the testimony and evidence presented at trial.

Judge Axelrad rejected Myra's position that she should be reunited with Logan and Luna. In that regard, the judge relied on the expert testimony of Dr. Freedman and noted that Myra's demeanor at trial supported Dr. Freedman's opinion that she would shut down and not be able to address the children's needs.

Concerning prong four, Judge Axelrad found that termination of Myra's and Arthur's parental rights will not do more harm than good. Relying on the unrebutted testimony of Dr. Freedman, the judge found that there was no evidence that the children would suffer significant harm from termination of

their ties with Myra and Arthur. The judge also found that the children's need for permanency and stability was "best served" by adoption by their respective resource caregivers.

Myra and Arthur each filed separate appeals from the judgment. Those appeals were then consolidated.

## II.

Myra challenges the judgment by contending that (1) she had not endangered Logan's or Luna's health or development; (2) there was no clear and convincing evidence that the Division made reasonable efforts to reunite her with Logan and Luna; (3) there was no clear and convincing evidence that the trial court did not consider alternatives to the termination of her parental rights; and (4) the trial court erred in concluding that the termination of her parental rights will not do more harm than good, particularly because that conclusion was not based on an individual evaluation of each child.

In his appeal, Arthur challenges the trial judge's findings concerning each of the four prongs of the child's best-interests test. He argues that his troubles with addiction, housing instability, and incarceration did not establish harm under prongs one and two. Like Myra, Arthur also argues that the trial judge did not follow the law regarding an evaluation of alternatives to the termination

13

of his parental rights. Finally, he asserts that he should have been given more time to "heal" his relationship with Adam and, therefore, it was an error for the trial judge to find that termination of his parental rights will not do more harm than good.

The record and law do not support Myra's or Arthur's challenges to the judgment. Instead, we affirm the judgment because Judge Axelrad's findings concerning the four prongs are supported by substantial credible evidence. Judge Axelrad also correctly applied her findings to the well-established law.

A.    Our Standard of Review.

An appellate court's review of a trial court's decision to terminate parental rights is limited. N.J. Div. of Child Prot. & Permanency v. C.J.R., 452 N.J. Super. 454, 468 (App. Div. 2017) (citing N.J. Div. of Youth & Fam. Servs. v. M.M., 189 N.J. 261, 278-79 (2007)). An appellate court will not reverse the trial court's "termination decision 'when there is substantial credible evidence in the record to support the court's findings.'" Ibid. (quoting N.J. Div. of Youth & Fam. Servs. v. E.P., 196 N.J. 88, 104 (2008)). So, "[o]nly when the trial court's conclusions are so 'clearly mistaken' or 'wide of the mark' should an appellate court intervene and make its own findings to ensure that there is not a denial of justice." E.P., 196 N.J. at 104 (quoting N.J. Div. of Youth & Fam. Servs. v.

G.L., 191 N.J. 596, 605 (2007)). No deference is given to the trial court's interpretations of the law, which are reviewed de novo. D.W. v. R.W., 212 N.J. 232, 245-46 (2012) (citing Balsamides v. Protameen Chems., Inc., 160 N.J. 352, 372 (1999)).

B.    The Four Prongs for Termination of Parental Rights.

To terminate parental rights, the Division must prove by clear and convincing evidence each element of the "best interests of the child" test, codified by N.J.S.A. 30:4C-15.1(a). M.M., 189 N.J. at 280. That test is comprised of the following four prongs:

> (1) The child's safety, health, or development has been or will continue to be endangered by the parental relationship;
>
> (2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm;
>
> (3) The [D]ivision has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights; and
>
> (4) Termination of parental rights will not do more harm than good.
>
> [N.J.S.A. 30:4C-15.1(a).]

A-2680-23

These prongs "are not discrete and separate," but rather "relate to and overlap with one another to provide a comprehensive standard that identifies a child's best interests." In re Guardianship of K.H.O., 161 N.J. 337, 348 (1999).

Effective July 2021, various sections of statutes concerning child protective services were amended. See L. 2021, c. 154. Those amendments included a change to prong two of the best-interests test. The Legislature removed the following sentence: "Such harm may include evidence that separating the child from his resource family parents would cause serious and enduring emotional or psychological harm to the child." L. 2021, c. 154, § 9 (codified at N.J.S.A. 30:4C-15.1(a)(2)). Accordingly, any harm a child might suffer by removing him or her from the resource parent should no longer be considered by a court under prong two. Nevertheless, a court may still consider the child's bond with the resource parent, including harm resulting from the destruction of that bond, under prong four of the best-interests test. N.J. Div. of Child Prot. & Permanency v. D.C.A., 256 N.J. 4, 26 (2023) (explaining that in amending N.J.S.A. 30:4C-15.1(a)(2) in 2021, the Legislature "acted to preclude trial courts from considering harm resulting from the termination of a child's relationship with resource parents when they assess parental fitness under the

second prong, but not to generally bar such evidence from any aspect of the trial court's inquiry").

1.  Prongs One and Two.

Judge Axelrad's findings regarding prongs one and two are amply supported by substantial credible evidence. The record establishes that both Myra and Arthur endangered the safety and development of their children. The children's removal in December 2021 was based on Myra's physical abuse of Noah while Arthur was in prison. Judge Axelrad's finding that Myra caused harm to Adam, Logan, and Luna was based on her inability to obtain the stability needed to be an adequate parent. Dr. Freedman's unrebutted testimony established that Myra suffered from mental health issues that prevented her from being an effective parent to any child. The doctor's testimony, coupled with the testimony by Cassidy, demonstrates that Myra was given years of services, but she was unable to obtain the stability needed to parent any child, much less two children, one of whom has specific needs.

Arthur argues that his incarceration, drug addiction, and lack of housing does not satisfy the harm requirement under prongs one and two. Judge Axelrad, however, did not find that it was his incarceration, addiction, or lack of housing that caused harm. Instead, she correctly found that his inability and

unwillingness to correct his addiction and find stable housing established that he could not provide a safe and stable home for Adam, or any other child. See N.J. Div. of Youth & Fam. Servs. v. L.M., 430 N.J. Super. 428, 444 (App. Div. 2013) (explaining that prong one can be met based on ongoing irresponsible behavior of a drug-addicted parent and the failure to take advantages of services offered by the Division).

We also reject Arthur's assertion that the Division should have provided additional time to allow him to address his problems and try to "heal" his relationship with Adam. It has long been recognized that permanency of a child is favored over protracted efforts of reunification, particularly when those efforts have gone on for years and there is no showing of a likelihood of the parent achieving stability. See, e.g., N.J. Div. of Youth & Fam. Servs v. C.S., 367 N.J. Super. 76, 111 (App. Div. 2004).

2.    Prong Three.

Prong three requires the Division to have made "reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home" and to have "considered alternatives to the termination of parental rights." N.J.S.A. 30:4C-15.1(a)(3). Reasonable efforts depend on the facts and circumstances of each case. N.J. Div. of Youth & Fam.

Servs. v. R.G., 217 N.J. 527, 557 (2014) (citing In re Guardianship of D.M.H., 161 N.J. 365, 387 (1999)).

Myra argues that the Division focused on providing reunification with an approach of "all the children or none of the children." She contends that the Division should have made efforts to provide her with services to reunite her with the two youngest children, Logan and Luna.

The services provided to Myra were designed to assist her to address her parenting deficiencies as to any of the children. The record amply demonstrates that Myra was provided with multiple services over several years, which included parenting skill classes, counseling, therapy, and regular visitation with the children. The evidence also demonstrates that Myra could not adequately address her mental health issues and her own instability. Further, Dr. Freedman credibly testified that Myra never presented a reasonable plan for reunification for the two youngest children. Indeed, although Myra testified she had a reunification plan, due to her own instability, she was unable to follow through to provide a safe and stable home environment.

Arthur argues that he should have been given more time. As we have already summarized, he was given years to try to show he could overcome his addictions, his involvement in criminal activity, and his inability to find stable

housing. He never showed the ability to overcome those problems. That point was reflected in his failure to appear at trial and to present any testimony concerning a viable reunification plan with Adam.

As to the second part of prong three, whether the court has considered alternatives to the termination of parental rights, Judge Axelrad's findings were also amply supported by substantial credible evidence. The judge found that reunification with Myra or Arthur was not in the best interests of any of the children. Moreover, Mable and Yara credibly testified that they had been informed of KLG, but they wished to adopt the children.

Arthur cites the Title 30 Amendments (2021) to support his argument that KLG is the best outcome for the children. But these amendments did not elevate KLG over adoption. Rather, they place both permanency option on equal footing. Courts are not required to impose KLG when the resource parent has decided on adoption and when adoption is in the child's best interests. See L. 2021, c. 154, § 4 (removing the requirement that the court find by clear and convincing evidence that adoption is "neither feasible nor likely," N.J.S.A. 3B:12A-6(d)(3), but preserving the requirement that they prove "[KLG] is in the child's best interest," N.J.S.A. 3B:12A-6(d)(4)); see also N.J. Div. of Child Prot. & Permanency v. M.M., 459 N.J. Super. 246, 275 (App. Div. 2019) (explaining

20

that when a resource parent "unequivocally, unambiguously, and unconditionally" wants to adopt "irrespective of [KLG]" and "termination of parental rights and adoption is clearly in the child's best interests, the final judgment to that effect should be reaffirmed").

    3.    Prong Four.

Prong four requires the court to determine that "[t]ermination of parental rights will not do more harm than good." N.J.S.A. 30:4C-15.1(a)(4). This prong does not require a showing that no harm will come to the children "as a result of the severing of biological ties." K.H.O., 161 N.J. at 355. Instead, the issue is "whether a child's interests will best be served by completely terminating the child's relationship with that parent." E.P., 196 N.J. at 108. "The crux . . . is the child's need for a permanent and stable home, along with a defined parent-child relationship." N.J. Div. of Youth and Fam. Servs. v. H.R., 431 N.J. Super. 212, 226 (App. Div. 2013). Prong four may be satisfied by "testimony of a 'well qualified expert who has had full opportunity to make a comprehensive, objective, and informed evaluation' of the child's relationship with both the natural parents and the foster parents." M.M., 189 N.J. at 281 (quoting In re Guardianship of J.C., 129 N.J. 1, 19 (1992)).

Judge Axelrad relied on all the testimony, including the unrebutted testimony of Dr. Freedman, in finding that termination of Myra's and Arthur's parental rights will not do more harm than good. Judge Axelrad appropriately considered that while Logan and Luna had positive but weak bonds with Myra, they had strong bonds with Yara and that she was the most stable and consistent caregiver over the last three years.

Myra's arguments that her bonds with Logan and Luna were affected by the virtual visits that she had with them is not persuasive. The record demonstrates that Myra was inconsistent with her visits with the children, and she also ignores that when she did have visits there was substantial credible evidence that she lacked the parenting skills to manage the children.

Arthur argues that he had a strong bond with Adam, but he acknowledged that he needed more time to heal his relationship. The evidence at trial, however, demonstrated that Arthur's bond with Adam was weak and Adam had a fear of his biological father.

Arthur also argues that prong four cannot be met because he had employment during the litigation. The evidence at trial, however, showed that Arthur's employment was not consistent and he was unemployed during the trial.

22

Just as importantly, Arthur does not adequately address Dr. Freedman's testimony that Arthur could not safely parent Adam, who has specific needs.

### III.

A review of all the evidence presented at trial establishes that Judge Axelrad's findings on each of the four prongs were amply supported by the record. See N.J. Div. of Youth & Fam. Servs. v. F.M., 211 N.J. 420, 448 (2012). Moreover, Judge Axelrad correctly summarized the law and correctly applied her factual findings to the law. See N.J. Div. of Child Prot. and Permanency v. P.O., 456 N.J. Super. 399, 407 (App. Div. 2018). We, therefore, affirm the judgment as to both Myra and Arthur.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division

A-2680-23