# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1208-24

NEW JERSEY DIVISION OF
CHILD PROTECTION AND
PERMANENCY,

     Plaintiff-Respondent,

v.

B.L.F.,

     Defendant-Appellant,

and

J.D.L.C.Q.C.,

     Defendant.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF G.L.F.,
a minor.

_____

     Submitted October 6, 2025 – Decided November 19, 2025

     Before Judges Natali and Bergman.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Hudson County, Docket No. FG-09-0102-24.

Jennifer N. Sellitti, Public Defender, attorney for appellant (Christine Olexa Saginor, Designated Counsel, on the briefs).

Matthew J. Platkin, Attorney General, attorney for respondent (Janet Greenberg Cohen, Assistant Attorney General, of counsel; Lakshmi Barot, Deputy Attorney General, on the brief).

Jennifer N. Sellitti, Public Defender, Law Guardian, attorney for minor G.L.F. (Meredith Alexis Pollock, Deputy Public Defender, of counsel; Melissa R. Vance, Assistant Deputy Public Defender, of counsel and on the brief).

PER CURIAM

Defendant B.L.F. appeals from a Family Part judgment terminating her parental rights to her daughter, G.L.F. ("Grace").[1]  After reviewing the record, considering the parties' arguments and the governing legal principles, we affirm for the cogent reasons set forth in the written opinion of Judge Margaret M. Marley.

---

[1] We use pseudonyms to protect the parties' and child's confidentiality.  R. 1:38-3(d).

I.

We glean the following pertinent facts and procedural history from the record. Beatrice and J.D.L.C.Q.C. ("Jose") are the biological parents of Grace, born in 2009, and J.F. ("James"), born in 2006. Jose died in 2012. The New Jersey Division of Child Protection and Permanency ("Division") first became involved with the defendant's family in 2017, after a referral alleging excessive corporal punishment of Grace. The investigation resulted in a "not established" finding, and no court actions were initiated nor were any services for the family mandated.

In May 2021, a new referral to the Division was made by a municipal police department, which reported that Grace, age eleven, had been sexually abused and had undergone an abortion after pregnancy. Grace initially stated she was abused by an unidentified perpetrator at a neighbor's house while defendant was working, leaving Grace and her brother unsupervised or supervised by another adult. Defendant claimed no prior awareness of abuse, only discovering the pregnancy after noticing Grace's changes and administering a home test. She accompanied Grace for the abortion and reported the abuse to police in June 2021.

A-1208-24

The Division's investigation was unable to identify the perpetrator but, because there was evidence that Grace had not been in defendant's direct supervision at the time, the Division determined the allegations to be "unfounded." Thereafter, services remained open, including psychological and medical evaluations, counseling for Grace and defendant and a parenting evaluation of defendant. Grace was additionally recommended for speech, language therapy, special education, and a sexual abuse victim program: Project Safe.

In February 2022, Grace's school reported a second pregnancy. Grace identified another student as the father but later claimed it was a cousin. During this time, defendant continued working overnight, leaving her children with an adult or alone. Services continued, including counseling and therapy interventions for Grace and skills training for defendant.

In May 2022, Grace, then age twelve, gave birth to Archie. Grace and defendant initially refused to disclose the father's identity. DNA testing later confirmed James, Grace's fifteen-year-old brother, was the biological father. He was subsequently charged with child endangerment after admitting to years of sexually abusing Grace which began when she was ten. James was later

A-1208-24

sentenced to probation, required to register under Megan's Law, and ordered to have no contact with Grace.

Grace informed the Division that James began sexually assaulting her when she was ten years old. She also reported that she told defendant about James's abuse after her first pregnancy, but defendant's only response was to instruct Grace to lock herself in her room and to tell James to stop. Allegations against defendant for inadequate supervision and placing Grace at risk were substantiated with defendant not contesting these findings. At that time, the Division removed both Grace and Archie from defendant's residence and the court ordered supervised visitation due to defendant's threats to flee the country.

Thereafter, Grace went through five non-relative placements. Defendant objected to placing Grace with relatives. Two relatives living abroad ultimately expressed interest, but Grace was unwilling to relocate due to immigration status issues and potential difficulties in returning to the country. Defendant stated she desired reunification with Grace and planned to install cameras or remove James, neither of which ever occurred. Grace also reported discomfort and mental health struggles in caring for Archie and told the Division she did not want to parent Archie, who was a "trigger" for her. Once Grace left defendant's

5

residence, James continued to reside there, even after reaching eighteen years of age.

During the attempted reunification period, the Division provided defendant with tailored Spanish-speaking therapy but discharged her from multiple programs for lack of progress and missing appointments. The Division coordinated extensive services for Grace, including psychological, neuropsychological, psychiatric testing, therapy, and education. Treatment included trauma-focused therapy and partial hospitalization, with chronic suicide attempts and self-harm. Grace's visits with defendant became volatile due to arguments between them. Defendant made promises to Grace that she could return home despite James residing there and violations of cell phone restrictions for Grace were shown. When confronted about these violations, defendant was unreceptive to the Division's concerns about Grace's internet access.

Based on the lack of progress with reunification, in May 2023, the court shifted Grace's permanency goal to termination of parental rights with a concurrent goal of reunification. Grace's mental health continued to decline, with her communicating her desire to simply "be a young girl."

6

Thereafter, because little to no progress was accomplished concerning reunification, the Division moved forward to a termination hearing. At trial, the Division presented witnesses who testified that defendant never accepted the DNA results, failed to remove James, and hampered relative assessments. One Division witness stated that Grace told her she "felt bad" but welcomed adoption. Another Division case worker explained Grace could only be matched with select adoptive homes after being declared legally free and Grace reported to her she was afraid of reunification and sexual abuse recurrence.

The Division also called Dr. Frank Dyer, Ph.D., as an expert witness. Dr. Dyer opined defendant was intellectually impaired, unable to protect Grace, lacked capacity for insight, never accepted the abuse of Grace by James or Archie's paternity, and prioritized James over Grace and concluded there was no realistic chance of improvement. He testified that Grace disclosed persistent delusions and self-harm, stating defendant did not believe her when she reported continued abuse. Dr. Dyer found defendant failed to provide a true parent-child bond nor protection, and recommended termination for defendant and adoption for Grace.

Dr. Kinya Swanson, Psy.D., testified on behalf of defendant and essentially agreed with Dr. Dyer that defendant's cognitive deficits impaired her

A-1208-24

parenting ability and judgment, but she believed a close, healthy bond existed with Grace. Dr. Swanson opined terminating defendant's parental rights would provide Grace with no benefit and the complete and permanent loss of her relationship with defendant would actually cause Grace severe and enduring harm because termination would take away all motherly emotional support. She found this would affect Grace's emotional and psychological development and would cause her to experience feelings of abandonment, dejection, poor self-esteem, and identity issues. While Dr. Swanson ultimately agreed that defendant was not fit to currently, or in the near future, independently parent Grace, she opined that severing their relationship at this stage would not be in Grace's best interests.

In a thorough eighty-five-page written opinion, the trial court terminated defendant's parental rights to Grace, finding that the Division proved by clear and convincing evidence that termination was in Grace's best interests under the four-prong test set forth at N.J.S.A. 30:4C-15.1(a).

On appeal, defendant raises the following points:

> POINT I
>
> THE TRIAL COURT ERRED IN CONCLUDING GRACE'S SAFETY, HEALTH, OR DEVELOPMENT HAS BEEN OR WILL BE

8

ENDANGERED BY A RELATIONSHIP WITH [DEFENDANT].

POINT II

THE TRIAL COURT ERRED IN CONCLUDING [DEFENDANT] IS UNWILLING OR UNABLE TO REMEDIATE HER PERCEIVED PARENTING ISSUES.

POINT III

[THE DIVISION] FAILED TO MAKE REASONABLE EFFORTS TO PROVIDE [DEFENDANT'S] FAMILY WITH SERVICES AND DID NOT PROPERLY CONSIDER ALTERNATIVES TO TERMINATION OF [DEFENDANT'S] PARENTAL RIGHTS.

POINT IV

THE JUDGMENT OF GUARDIANSHIP SHOULD BE REVERSED BECAUSE THE COURT GAVE UNDUE WEIGHT TO THE OPINION OF THE EXPERT RETAINED BY [THE DIVISION].

The Law Guardian and Division both argue the judgment terminating B.L.F.'s parental rights should be affirmed as the record clearly and convincingly supported the court's determination that all elements of N.J.S.A. 30:4C-15.1(a) were satisfied.

II.

We begin our analysis by acknowledging the governing legal principles in this appeal. An appellate court's review of a Family Part judge's factual findings in a guardianship trial is limited. In re Guardianship of J.N.H., 172 N.J. 440, 472 (2002). Those findings are "binding on appeal when supported by adequate, substantial, credible evidence." Cesare v. Cesare, 154 N.J. 394, 412 (1998) (citing Rova Farms Resort, Inc. v. Inv'rs Ins. Co., 65 N.J. 474, 484 (1974)). The court may reverse a factual finding only if there is "'a denial of justice' because the family court's 'conclusions are [ ] "clearly mistaken" or "wide of the mark."'" Parish v. Parish, 412 N.J. Super. 39, 48 (App. Div. 2010) (alteration in original) (quoting N.J. Div. of Youth & Fam. Servs. v. E.P., 196 N.J. 88, 104 (2008)); see also Cesare, 154 N.J. at 412 (holding that an appellate court should not disturb the trial court's factual findings unless they are "so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice") (quoting Rova Farms Resort, Inc., 65 N.J. at 484).

"[T]he conclusions that logically flow from those findings of fact are, likewise, entitled to deferential consideration upon appellate review." N.J. Div. of Youth & Fam. Servs. v. R.L., 388 N.J. Super. 81, 89 (App. Div. 2006).

10

However, the "interpretation of the law and the legal consequences that flow from established facts are not entitled to any special deference." Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995). "Whether the facts found by the trial court are sufficient to satisfy the applicable legal standard is a question of law subject to plenary review on appeal." State v. Cleveland, 371 N.J. Super. 286, 295 (App. Div. 2004); see also N.J. Div. of Child Prot. & Permanency v. A.B., 231 N.J. 354, 369 (2017) ("[W]e review the judge's legal conclusions de novo."). In addition, no appellate deference is owed to a trial court's interpretation of a statute. Maeker v. Ross, 219 N.J. 565, 574 (2014) (citing Aronberg v. Tolbert, 207 N.J. 587, 597 (2011)); see also N.J. Div. of Child Prot. & Permanency v. Y.N., 220 N.J. 165, 177 (2014) ("[W]e need not defer to [a lower] court's interpretive conclusions.").

Turning to the substantive legal principles, the Legislature created a multi-part test to determine when it is in the child's best interests to terminate parental rights. Specifically, N.J.S.A. 30:4C-15.1(a) requires the Division to prove four prongs by clear and convincing evidence, which are:

> (1) The child's safety, health, or development has been or will continue to be endangered by the parental relationship;
>
> (2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to

11

provide a safe and stable home for the child and the delay of permanent placement will add to the harm;

(3) [D]ivision has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights; and

(4) Termination of parental rights will not do more harm than good.

[N.J.S.A. 30:4C-15.1(a).]

These requirements "are not discrete and separate; they relate to and overlap with one another to provide a comprehensive standard that identifies a child's best interests." In re Guardianship of K.H.O., 161 N.J. 337, 348 (1999). "The considerations involved in determinations of parental fitness are 'extremely fact sensitive' and require particularized evidence that address the specific circumstances in the given case." Ibid. (quoting Matter of Adoption of L.A.S., 134 N.J. 127, 139 (1993)).

## III.

We first address defendant's argument that the Division did not satisfy prong one and the trial court erred in finding her relationship endangers Grace. Defendant supports this contention by pointing to a lack of prior incidents; certain safety precautions she instituted to protect Grace; her lack of knowledge

12

of the abuse; her willingness to relocate James; her cooperation with placement of Grace; and her cognitive limitations. We are not persuaded by these contentions.

To satisfy prong one, there must be evidence the parent caused harm or created a threat to the child's health and development. The Division need not wait for irreversible impairment; existing harm threatening ongoing detriment is sufficient. N.J. Div. of Youth & Fam. Servs. v. L.M., 430 N.J. Super. 428, 444 (App. Div. 2013). The trial court's findings that the ongoing sexual abuse by Grace's brother, defendant's refusal to believe Grace, and her refusal to act to protect her were a serious risk to Grace's safety and development were supported by substantial evidence in the record. The record exhibits substantial proofs that defendant repeatedly sought to deflect responsibility and hindered the Division's search for placements, which supported the trial court's finding that Grace's interests were not a priority.

Further, the court appropriately rejected defendant's argument that Grace's own challenges would preclude adoption, noting that progress was impeded by defendant's denial and lack of support. Defendant's claim that she cooperated is belied by evidence of threats to obstruct any placement and minimal family placement suggestions. Here, we conclude clear and convincing evidence

existed in the record to support the trial court's conclusion that prong one was satisfied.

As to prong two, defendant asserts the court erred by finding the Division satisfied this prong because she acted in good faith toward reunification despite the Division's alleged failure to accommodate her cognitive limits. Prong two requires a showing of parental unfitness and inability or unwillingness to eliminate harm. K.H.O., 161 N.J. at 352; In re Guardianship of D.M.H., 161 N.J. 365, 379 (1999).

The trial court found there was no significant improvement in defendant's capacity to parent based on the expert testimony that her mental health and cognitive limitations persist. The record shows that defendant's participation in therapy was inconsistent, with multiple discharges and refusals to address necessary behavioral changes. The evidence at trial also indicated the therapy and services offered did not lead to progress or improvement.

Defendant's claim that specialized services were required is contradicted by the expert's assessment that even tailored interventions would not remedy these deficits. Here, the Division provided extensive services to defendant, none of which succeeded in her making the necessary changes or improvements.

Furthermore, contrary to defendant's contention, there is no evidence in the record that the Division denied any service requested by defendant.

The record further supports the trial court's finding that defendant minimized responsibility in assisting placement, providing only two names, and refusing broader cooperation, including threats there would be repercussions if certain relatives were contacted. The expert testimony that there was a need for permanency which required termination supported the court's findings. Thus, the court's conclusion that defendant is unwilling or unable to remediate her issues is supported by substantial, credible evidence in the record. We further conclude, as did the trial court, that defendant's proposal to install surveillance and remove James was insufficient, as her own expert opined she wasn't suitable to independently parent Grace.

We next address defendant's contention that the Division did not satisfy prong three because it failed to engage in reasonable reunification efforts or fully explore alternatives. We incorporate our factual determinations set forth above concerning prongs one and two and add the following. The record clearly supports the reunification therapy and other services offered to defendant exhibiting substantial reunification efforts by the Division. We reiterate that the sufficiency of services must be judged by case circumstances and parent

15

participation, not on its success or failure. D.M.H., 161 N.J. at 390. We further agree with the trial court's finding that defendant's suggestion that her adult daughter, Felicia, be considered for placement to be inadequate, as Felicia lacked immediate capacity for Grace's placement and did not have appropriate living accommodations for her. We conclude the trial court's finding that reasonable efforts were made by the Division was supported by sufficient, credible evidence in the record.

Finally, we address defendant's contention that the Division failed to satisfy the fourth prong, primarily asserting the trial court improperly favored Dr. Dyer over Dr. Swanson to support its finding this prong was satisfied. The fourth prong is a fail-safe, not requiring proof that no harm will occur from severing ties, but that termination serves the child's best interests. N.J. Div. of Youth & Fam. Services v. R.G., 217 N.J. 527, 559 (2014); K.H.O., 161 N.J. at 355.

"It is the unique role of the [fact finder] to assess the credibility of the witnesses and the weight to be given to their testimony [and] [e]xpert testimony is treated no differently . . . . " City of Long Branch v. Liu, 203 N.J. 464, 491 (2010). Generally, we rely on the trial court's "acceptance of the credibility of the expert's testimony and the court's fact-findings based thereon . . . [because]

16

the trial court is better positioned to evaluate the witness'[s] credibility, qualifications, and the weight to be accorded [his or her] testimony." D.M.H., 161 N.J. at 382. Expert testimony should not be given greater weight than other evidence and should be scrutinized in light of "common sense and ordinary experience." In re Yaccarino, 117 N.J. 175, 196 (1989). A fact finder is entitled to accept some of an expert's testimony and reject the rest. In re Guardianship of J.C., 129 N.J. 1, 24 (1992).

We conclude the trial judge's reliance on Dr. Dyer's testimony was a reasonable exercise of discretion. Dr. Dyer's methods were conventional, including direct evaluations and records review, and his testimony was appropriately considered as credible by the court. The court found the evidence presented by defendant that she had a healthy bond with Grace was superficial and contradicted by credible testimony and information in the Division's records. We conclude defendant's critiques of Dr. Dyer's work for the Division and his alleged reliance on inaccurate records are misplaced as the record is clear that he utilized sufficient and reliable sources of information to support his opinions. The trial court's reliance on Dr. Dyer's opinion in determining that termination would not do more harm than good for Grace along with its overall weighing of other relevant factors was not erroneous and was based on

substantial evidence in the record. Additionally, we conclude the trial court's determination that Dr. Swanson's testimony lacked factual and analytical support is adequately borne out by the testimony and evidence.

Lastly, defendant asserts that the court erred in considering the length of time that Grace spent in foster care to support its termination finding. Defendant relies on N.J. Div. of Youth & Fam. Servs. v. I.S., for the proposition that "the period of time a child has spent in foster case is not determinative of whether parental rights to that child should be terminated. . . ." 202 N.J. 145, 169-70 (2010). However, we conclude this is a narrow view based on the facts of the case before us. Here, Judge Marley did not simply rely on the amount of time Grace was subjected to foster care, rather she acknowledged this as one of many factors it considered in concluding that termination is in Grace's best interests.

To the extent we have not specifically addressed them, any remaining arguments raised by defendant lack sufficient merit to warrant discussion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division

18                                                                    A-1208-24